# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

INTERACTIVE
COMMUNICATIONS
INTERNATIONAL, INC. and
INCOMM FINANCIAL
SERVICES, INC.,

        *Plaintiffs*,

        v.

DAVID CHIU and the CITY AND
COUNTY OF SAN FRANCISCO,

        *Defendants*.

Civil Action No._____

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

# TABLE OF CONTENTS

STATEMENT OF THE CASE .................................................................4

THE PARTIES ....................................................................................14

I.    Plaintiffs Interactive Communications International, Inc. and InComm Financial Services, Inc. ..........................................................14

II.   Defendant The City and County of San Francisco ..................................16

III.  Defendant David Chiu ..................................................16

JURISDICTION AND VENUE ..............................................................17

FACTUAL ALLEGATIONS ...................................................................19

I.    InComm's Role in the Open-Loop Gift Card Space ................................19

II.   The Evolving Threat of Gift Card Fraud ..................................21

      A.   The Prevention of Package Tampering..........................................21

      B.   The Emergent International Money-Laundering Organizations ..................................................27

      C.   The Sophistication of the Current Threat .....................................29

      D.   InComm Has Partnered Closely With Law Enforcement and Adapted Its Security Measures ......................................38

III.  Instead of Working with InComm to Safeguard Consumers, the San Francisco City Attorney Has Arbitrarily Made InComm a Scapegoat ....40

      A.   The SFCAO's Failure to Conduct a Minimal Factual Investigation ..................................................42

      B.   The SFCAO's Pretextual Focus on InComm ..............................47

IV.   San Francisco's Suit Against InComm is an Improper Effort to Generate Local Revenue and Serve Other Parochial Interests ................................53

      A.   The Unfettered Discretion of the SFCAO's Affirmative Litigation Unit ..................................................54

B.  The SFCAO's Motive and Opportunity to Use UCL Litigation for Revenue Generation ................................................. 56

C.  San Francisco is Facing Dire Challenges and Revenue Shortages ........................................................................... 60

D.  The SFCAO's Express Reliance on UCL Cases for Revenue Generation ................................................................ 64

E.  Defendants' Apparent Favoritism Toward Blackhawk ................. 74

F.  Defendants' Defeat of Federal Jurisdiction ................................... 77

G.  Harm to InComm ......................................................................... 79

V.  David Chiu Makes False and Defamatory Statements About InComm .. 80

COUNT I ......................................................................................................... 90

COUNT II ........................................................................................................ 94

COUNT III ....................................................................................................... 98

COUNT IV ....................................................................................................... 99

COUNT V ...................................................................................................... 100

PRAYER FOR RELIEF ................................................................................ 101

Plaintiffs Interactive Communications International, Inc. ("ICI") and InComm Financial Services, Inc. ("IFS," and together with ICI "InComm"), through its attorneys, makes the following allegations against Defendants David Chiu and the City and County of San Francisco (collectively "Defendants"):

1.    In this suit, InComm seeks redress for unconstitutional abuses of power by the City and County of San Francisco (the "City") and by David Chiu, the San Francisco City Attorney acting in his official capacity. Chiu and his colleagues at the San Francisco City Attorney's Office ("SFCAO") enjoy tremendous power to enforce California consumer-protection laws and extract monetary penalties, which are payable to the City treasury. As the City faces a devastating financial crisis, Defendants have publicly declared a campaign to wield that power by drumming up lawsuits to generate "revenue for the City." They have also publicly identified InComm as a target of that campaign.

2.    That is why, in November 2023, Defendants sued IFS in California state court, alleging that the Georgia-based company had defrauded consumers with regard to its Vanilla-branded prepaid gift cards. Chiu then went on a national press offensive against InComm, castigating the company for its "inadequate" product security and "egregious" conduct, knowing all the while that he had no factual basis whatsoever for these claims.

1

3.     Defendants' claims in the California suit are utterly meritless.  But that is not the basis for InComm's suit in this Court.  Rather, the impetus for this suit is Defendants' ongoing persecution of InComm with patently unconstitutional motives.  Defendants have barely pretended to have a factual basis for their accusations, or even to have looked for one.  They are, simply and transparently, seeking a quick local cash influx by shaking down an out-of-state company.  They are also giving a competitive edge to InComm's chief competitor, a Bay Area tech company with deep connections to the City's counsel.  And because Defendants' use of consumer-protection suits as a cash cow is not authorized by California law, they are not serving any valid state interest.

4.     Most regrettably of all, Defendants have failed to promote—and, indeed, have actively undermined—consumers' interests.  By promoting false information about the scope and causes of prepaid card fraud, Defendants have misled consumers, deprived them of common-sense information about how to protect themselves from fraud, and hindered InComm's efforts to educate and support its cardholders on this important topic.  In other words, tasked with protecting consumers, Defendants acted directly contrary to that objective, in the service of their short-term imperatives to generate revenue and aid a local business.

5.     By using their public enforcement power for these parochial, self-serving, and counterproductive aims, Defendants have violated the Equal Protection

and Dormant Commerce Clauses of the United States Constitution, and have stigmatized InComm's business in violation of the Due Process Clause of the United States Constitution.  These violations entitle InComm to injunctive relief, recovery of damages, and other remedies under 28 U.S.C. § 1983.

6.     However, Defendants have blocked InComm from pursuing those remedies in California by evading a federal forum on highly questionable grounds. Chiu's office successfully deflected InComm's attempt to remove the California suit on diversity grounds, by arguing that the only real party in interest was "the People of the State of California," and that the suit did not "seek[] any . . . benefit to the City as an entity."  That is untrue.  In budget-related documents dated just weeks after, Defendants frankly described this suit and others like it as a valuable means of "recovering revenue for the City and County of San Francisco," and pointed to past cases' success in generating "revenue for the City."

7.     In other words, the City of San Francisco has adopted an explicit policy of using suits like the one against InComm to serve as its bailout fund.  Yet, on the false pretense that the City had no stake in the suit against InComm, Defendants avoided removal and deprived InComm of a forum for vindicating its federal rights in California.  InComm now seeks to do so in this Court.  InComm also seeks redress under Georgia state law for Chiu's false and defamatory statements in the media.

3

## STATEMENT OF THE CASE

8.    Defendants' improper motives in targeting InComm are apparent from a combination of their own statements about the objectives of consumer-protection actions; their political incentives and alliances; the aberrational nature of their conduct as compared with other law enforcement entities; and their utter failure to investigate their claims.

### *The Prepaid Card Fraud Issue*

9.    Defendants' accusations against InComm in the San Francisco Superior Court suit center upon the subject of fraud involving open-loop prepaid cards, a type of gift card.  InComm has established itself as one of the nation's top gift card service providers by offering innovative, convenient products, including its open-loop non-reloadable Vanilla Prepaid Gift Cards ("Vanilla Cards").

10.    Like all payment products, Vanilla Cards are sometimes targeted by fraudsters who seek to steal the cards' balances from legitimate cardholders. Although InComm deploys sophisticated anti-fraud measures, which continuously and successfully thwart fraud attempts, no company has completely eliminated payment card fraud.  Over the past two years, fraud activity has been largely attributable to sophisticated China-based money-laundering syndicates.  These syndicates operate on an international scale—precisely because anti-fraud measures

such as InComm's have made it difficult for less sophisticated fraud operations to achieve profitability.

11.    These sophisticated fraud activities have not been limited, or even primarily directed, to Vanilla Cards.  On the contrary, they have affected all aspects of the financial services industry, including many brands and types of prepaid cards. InComm has devoted considerable resources to adapting its anti-fraud measures to this latest incarnation of the fraud threat, and has made—and continues to make— substantial progress toward neutralizing it.

12.    This large-scale fraud operation has drawn attention from law enforcement, and has prompted arrests across the United States of ring "runners" in possession of stashes of stolen gift cards.  Several state prosecutors have obtained prison sentences for the participants, and many other prosecutions are now in progress.

13.    Federal law enforcement has also become involved.  Homeland Security Investigations ("HSI") has initiated a coordinated effort to track and extinguish the fraud, known as "Project Red Hook."  Through this campaign, HSI seeks to educate local law enforcement about the coordinated nature of the threat and to assist local prosecutors in bringing the perpetrators to justice.  All of these law enforcement efforts reflect the expanding scale and increasing sophistication of the individuals and organizations attempting to commit prepaid card fraud.

14.    As a market leader in prepaid gift cards, InComm has proudly served as a key partner to law enforcement in these efforts.  InComm is part of an anti-fraud task force consisting of law enforcement and private industry stakeholders, whose members regularly exchange information about fraud activity and effective preventive measures.  InComm has also provided guidance and information to state prosecutors of gift card fraud perpetrators.

***Defendants' Aberrational and Inexplicable Attack on InComm***

15.    Over the past two years, as InComm has collaborated on the gift card fraud issue with law enforcement agencies at all levels, not one of those agencies has suggested that InComm is to blame for the problem.  On the contrary, they have sought InComm's support and expertise in combatting it.

16.    But in November 2023, Defendants—the City of San Francisco and City Attorney David Chiu—went in a wildly different direction.  With no warning or apparent pre-suit investigation, the SFCAO filed a scathing complaint in San Francisco Superior Court (the "San Francisco Action") alleging that gift card fraud was "made possible by InComm's inadequate security," which allowed Vanilla Card packaging to be "easily" breached.[1]

---

[1] *See California v. InComm Fin. Servs., Inc.*, No. CGC-23-610333 (Cal. Super. Ct.) Dkt. 2 ¶¶ 50, 56.

6

17.     This outlier viewpoint did not reflect that Defendants knew something about gift card fraud that others had missed.  In fact, Defendants knew pretty much nothing about it.  Their complaint was so rife with factual errors that it was clear they had not conducted even a basic pre-suit investigation.  In the face of widely-available information about the complexity and scope of the fraud threat, they declared gift card fraud an "unsophisticated" enterprise, limited to Vanilla Cards and attributable to the cards' allegedly "inadequate" security.

18.     This charge was wrong, and Defendants offered no factual support for it.  Their central contention was that Vanilla Card packaging can be "easily" opened and resealed without leaving signs of tampering.  According to Defendants, this "easily" exploited vulnerability allows fraudsters to steal card information (i.e., the Vanilla Cards' 16-digit card number, expiration date, and CVV) before the cards are activated—and ultimately use that information to spend the cards' balances.

19.     While it is true that package tampering is a fraud method employed by Chinese money-laundering syndicates, Defendants' central contention—that Vanilla's "inadequate" packaging makes this form of fraud "easy"—is plainly incorrect.  Indeed, the sophistication and skill required to commit this form of fraud, combined with the high success rate of InComm's anti-fraud measures at thwarting it, is the reason that gift card fraud is attempted primarily by organized criminal operations.

7

20.     Defendants knew or should have known as much before filing their bogus claims.  Notably, although their primary assertion was that Vanilla Card packaging is "easy" to open and reseal without leaving signs of tampering, they did not say *how*, exactly, one goes about this "easy" task.  They also did not recount any instances of its successful execution.

21.     This oversight is striking.  It is not as though Vanilla Cards are difficult to come by.  On the contrary, there is a pharmacy that sells Vanilla Cards at 1301 Market Street in San Francisco—a *one-minute walk* from the San Francisco City Attorney's Office.  Before suing InComm for making its packages too "easy" to open and reseal, the SFCAO could easily have acquired some cards and investigated the matter firsthand.  The SFCAO's failure to do so suggests that it was not trying to get the facts right.

22.     Most fundamentally, Defendants failed to provide any basis whatsoever for their decision to single out InComm, as opposed to others in the industry.  Though they accuse InComm of falling short of its competitors in card security, they do not offer a shred of data suggesting that Vanilla cardholders experience higher rates of fraud than consumers of similar products.

23.     Although they observe that some other card packages appear to have different security features than the Vanilla Cards, they do not allege that these features reduce fraud.  Indeed, these comparative allegations are flimsy to the point

of insincerity.  The complaint's description of the products is so fundamentally incorrect that it reveals that the SFCAO did not bother to obtain and examine the products before filing suit.  Instead, Defendants appear to have made comparative claims about various card packages' ease of tampering based on photos of the packages they found on the internet.

24.    There is, of course, nothing unlawful about filing a legally deficient complaint.  But the SFCAO's complaint is not just that.  Its deficiencies are so profound and obvious as to suggest that the SFCAO made no genuine effort to get the facts right.  Rather, the SFCAO was targeting InComm for reasons unrelated to the merits.

### Defendants' Improper Motives

25.    Although Chiu purportedly filed suit on behalf of "the People of the State of California," protecting consumers had nothing to do with it.  The so-called consumer-protection complaint that Defendants filed against InComm does not identify even one California consumer who claims to have been injured.

26.    In reality, Chiu and the City acted with a covert, and patently unconstitutional, agenda.  Facing a budget shortfall that left the City Attorney's Office understaffed, along with a skyrocketing volume of claims against the City, Chiu sought to shake down an out-of-state company to generate quick revenue for

the local budget.  The case also provided an opportunity to tip the scales toward InComm's chief competitor, headquartered in the San Francisco Bay Area.

27.    This conduct was enabled, to a degree, by the unusual structure of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), the basis for the purported claims against InComm.  The UCL enables the SFCAO to claim a four-figure penalty for every supposedly affected consumer in California—and to direct all of those recoveries into the City's coffers.

28.    In return, the UCL also requires that these recovery funds be spent exclusively on consumer-protection actions.  But the statute imposes no enforcement mechanism for that requirement, and Defendants' public comments raise serious doubts about their compliance with it.    To Defendants, consumer-protection enforcement is a "revenue" source, flowing entirely to their relatively small municipality (population 800,000).

29.    Chiu has made no secret of his plan to use the UCL as a cash cow for his own office.  In public documents, the SFCAO—faced with the prospect of budget cuts—proposed using "consumer-protection" suits to cover shortfalls in the operating budget, avert layoffs, and net "revenue for the City."  In its budget proposal for 2025, the SFCAO pointed ***specifically*** to the lawsuit against InComm as an example of this fiscal health measure at work.

30.    It is no accident that the SFCAO targeted a Georgia company for this revenue-generation.  The last thing San Francisco needs in the face of a massive and well-reported exodus of residents and businesses is to saddle a local company with the burden of litigation, the possibility of hefty fines, and the accompanying bad press.  But by contrast, a bogus UCL suit against InComm presents no economic threat to San Francisco or political risk for Defendants.

31.    There is also another factor:  any suit that harms InComm—especially one that is widely reported—could only benefit InComm's primary competitor, Blackhawk Network, Inc. ("Blackhawk"), which is based in the Bay Area.  There is no question that Chiu's office knew as much when filing suit, because one of the attorneys responsible for the case against InComm had recently decamped from a private law firm that represents both the SFCAO and Blackhawk.  There, he had worked with a partner who served as the lead lawyer in an adversarial patent matter between Blackhawk and InComm, which culminated in a 2023 appeal before the U.S. Court of Appeals for the Federal Circuit.  These circumstances strongly suggest that Defendants' lawsuit was designed to trigger a local cash influx and advantage a particular local business, and not to protect consumers at all.

### Chiu's Defamatory Press Offensive

32.    Chiu also knew the pressure on InComm to settle would be greater if the suit was accompanied by bad press.  So he and his office went on a media blitz

11

soon after the suit against InComm was filed, spreading falsehoods to a wide public audience.  Shortly after filing, the SFCAO's press office made at least half a dozen overtures to various media outlets, encouraging coverage of the complaint and offering Chiu's availability for an interview.  The press office continued to engage with the media about the lawsuit in the months after filing.

33.    Many media outlets took Chiu up on his offer, and his vindictive indictments of InComm and its products ran in news articles from coast to coast—including on an Atlanta-based local news show.  In press appearances, Chiu did not limit himself to recounting the allegations in the complaint.  He elaborated on the claim that defrauding Vanilla Cards was a "pretty unsophisticated crime" that was just a matter of "quietly" opening the package in-store and returning it to the rack.  This is wrong:  package tampering is virtually impossible to execute in-store, as the SFCAO could have determined through minimal investigation.  Instead, the criminals who attempt package tampering generally carry out their crimes at centralized headquarters using special equipment.

34.    Chiu also proclaimed that "all [fraudsters] have to do is just track when the card has been activated" and then spend the money "the second" that occurs.  This, too, is wrong.  In fact, InComm makes such pre-activation "tracking" impossible and has done so for years—another fact that the SFCAO could have ascertained with a modicum of pre-suit investigation.

35.    Worst of all—and directly contrary to his supposed role as a protector of consumers—Chiu dispensed terrible advice about how shoppers could protect themselves from fraud.  Rather than giving consumers the basic tools to avoid being victimized, Chiu told consumers that their best bet was to stop buying Vanilla Cards altogether.  In reality, this act is neither necessary nor sufficient to reduce an individual's risk of being targeted by fraud, so the only effect of Chiu's "advice" was to lull consumers into a false sense of security when purchasing other prepaid products.  He also pronounced InComm "the most egregious" prepaid card company, though as described above, his office cited zero comparative data to this effect.

36.    The City's lawsuit and Chiu's defamatory statements have caused InComm irremediable harm.  InComm has been forced to expend time and expense defending Chiu's lawsuit.   Chiu's baseless suit and statements have caused uncertainty among InComm's retail partners and undermined its hard-earned reputation for integrity.  And innumerable consumers may have avoided purchasing InComm's products based on Chiu's scaremongering tactics.

37.    Chiu and the attorneys in his office wield great power to enforce California laws and capitalize on the megaphone their positions of trust confer.  But Defendants may not intentionally target companies and shake them down for cash to supplement their local budgets, with no legitimate basis for doing so.  They may not use their enforcement authority to put a thumb on the scale for local businesses

13

as against more distant ones, thus impermissibly burdening interstate commerce and acting with improper animus. And they may not selectively use their law-enforcement authority to impose on InComm a "stigma-plus," endangering its business reputation and goodwill in the community, saddling the company with an unjustified label of infamy, and arbitrarily treating it less favorably than similarly-situated California companies.

38.     By doing all of these things, Defendants have violated the Due Process, Equal Protection, and Commerce Clauses of the United States Constitution, entitling InComm to redress under 28 U.S.C. § 1983. This is true regardless of how the state-court suit is resolved, because the mere fact of being arbitrarily targeted, publicly defamed, and pressured for a settlement has caused injury to InComm and continues to do so. InComm is also entitled to redress under Georgia law for Chiu's false and defamatory statements, which he made in national media outlets, with knowledge of or reckless disregard for their falsity.

## THE PARTIES

### I.     Plaintiffs Interactive Communications International, Inc. and InComm Financial Services, Inc.

39.     Interactive Communications International, Inc. ("ICI") is a Florida corporation headquartered in Atlanta, Georgia. ICI is the primary operating entity

responsible for physical gift cards in the InComm family of companies, collectively known as InComm Payments.

40.     InComm Financial Services, Inc. ("IFS," and collectively with ICI and their affiliates, "InComm") is a South Dakota corporation headquartered in Columbus, Georgia.  IFS is a corporate affiliate of ICI, and also falls under the umbrella of associated entities collectively known as InComm Payments.

41.     Since its founding in Atlanta in 1992, InComm has developed, distributed, marketed, and serviced a variety of innovative payment products. Among its portfolio of innovative financial products are prepaid non-reloadable gift cards, including the popular Vanilla Cards.  ICI offers these products in combination with its affiliate IFS—a licensed money transmitter in all 49 states that require a license, as well as the District of Columbia, the U.S. Virgin Islands, and Puerto Rico—along with several issuing banks.  The products are offered on multiple credit card networks (e.g., Visa and MasterCard).  ICI and IFS together employ InComm's domestic workforce, totaling more than 1,800 employees, of which approximately 1,250 are located in Georgia, primarily in Atlanta and Columbus.  These Georgia-based employees' job responsibilities include, among other things, packaging design, marketing, prepaid products security, fraud prevention, and customer service.

## II.    Defendant The City and County of San Francisco

42.    The City and County of San Francisco is a municipal entity in the State of California, with a population of roughly 800,000.  It has a chartered municipal system of government, consisting of co-equal executive and legislative branches, pursuant to which the City establishes city departments, boards, and commissions.

43.    The SFCAO is a chartered office of the City and County of San Francisco.  The City Attorney is elected by the citizens of San Francisco and serves as part of the executive branch.

## III.    Defendant David Chiu

44.    Defendant David Chiu is the San Francisco City Attorney.  According to his 2024 re-election website, Chiu is a resident of San Francisco, California.

45.    As City Attorney, Chiu oversees the SFCAO, an instrumentality of city government.  The SFCAO holds itself out as "a national model for public law offices, bringing landmark cases to protect and expand the rights of San Franciscans," while also serving as legal counsel for "about 100 city departments, boards and commissions" in the City and County of San Francisco.[2]  Chiu was initially

---

[2] *Biography of David Chu*, City Attorney of San Francisco, https://www.sfcityattorney.org/aboutus/thecityattorney/.

appointed City Attorney by Mayor London Breed of San Francisco in 2021.  He was re-elected to that position earlier this month after garnering roughly 271,000 votes.[3]

## JURISDICTION AND VENUE

46.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 1343(a)(3) because the federal claims arise under the Constitution and laws of the United States.  The Court has supplemental jurisdiction over InComm's state-law claim under 28 U.S.C. § 1367(a) because it arises from related facts and circumstances to InComm's federal claims and is so related to those claims that it forms part of the same case or controversy.

47.    This Court has personal jurisdiction over Defendants David Chiu and the City of San Francisco under the Due Process Clause and Georgia's long-arm statute (O-C-G-A- § 9-10-91(1) and (3)) because they targeted IFS, knowing it to be a Georgia entity, with their unfounded and unlawfully-motivated action.  Defendants knew or could have easily foreseen that their persistent course of conduct in maintaining baseless claims against InComm would cause IFS and InComm monetary damages, reputational damage, and other harms within the State of Georgia.

---

[3] San Francisco Election Results and Live Maps – 2024, S.F. Chron. (Nov. 12, 2024), https://www.sfchronicle.com/projects/2024/election-results/san-francisco.

48.    Defendants also knew or should have reasonably foreseen that suing InComm would both injure InComm and establish a persistent course of conduct with Georgia.  Among other things, they knew or should have known that litigation with a Georgia entity related to business functions carried out in Georgia could entail discovery of documents located in Georgia, depositions of witnesses in Georgia, and interactions with InComm employees, including in-house counsel, located in Georgia.

49.    Furthermore, as detailed further below, Defendants initiated this suit against InComm as part of a revenue-generating program to increase the budget of their own office and of the City.  The circumstances surrounding the suit, and Defendants' own statements, all support the inference that Defendants targeted InComm in part because of its status as a non-California business entity.

50.    Defendants also knowingly directed their false and defamatory statements about InComm to Georgia in each of the following ways:  (i) Chiu made false and defamatory statements during an appearance on WSB-TV, an Atlanta-area local news network; (ii) Defendants knowingly disseminated false and defamatory statements on national news outlets and on the internet, causing those statements to be disseminated in Georgia; and (iii) Defendants knew that InComm was a Georgia company, and thus knew or could have easily foreseen that their false and defamatory statements would cause InComm reputational harm and lost business

goodwill in Georgia.  This affords an additional basis for the Court's exercise of personal jurisdiction over Defendants.

51.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in the City of Atlanta, which is located within the Northern District of Georgia.

## FACTUAL ALLEGATIONS

### I.     InComm's Role in the Open-Loop Gift Card Space

52.     Chiu and the City have focused their improper persecution on InComm's Vanilla Cards, which are sold in retailers across the nation.  Vanilla Cards are "open-loop" prepaid gift cards, meaning that the cards' value can be redeemed at any online or brick-and-mortar retailer that participates in the affiliated credit card network.

53.     Vanilla Cards are available for sale for the amount of the card's face value plus a small activation fee (typically ranging from $3.95-$7.95).  Before a Vanilla Card is purchased and activated, it has no value.  But when the consumer purchases the card, the card is activated at the point of sale and "loaded" with its cash balance, generally an amount between $25-500.  Vanilla Cards are "non-reloadable," meaning that they cannot be reloaded with additional funds after they are activated.

19

54.    Vanilla Cards are also sometimes described as "anonymous," which means that they need not be registered to a specific account holder.  Rather, once a given card is activated and loaded, anyone who has the 16-digit card number, expiration date, and CVV can spend the card's balance.  This anonymity accounts for much of the cards' appeal, because it means they are easily transferable as gifts. At the same time, Vanilla Cards also offer benefits that cash does not, such as the ability to make purchases online, to check the card's balance and transaction history on InComm's website vanillagift.com, and to obtain a replacement for a lost or stolen card.

55.    InComm is one of the top U.S. providers of open-loop gift cards. InComm competes in that category with a number of other providers, including Blackhawk Network, Inc. ("Blackhawk").  Blackhawk is headquartered just across the San Francisco Bay from Defendants in Pleasanton, California, and named for the nearby Bay Area town of Blackhawk, California.

56.    Blackhawk was founded in the early 2000s as a unit within supermarket giant Safeway, which is also headquartered in Pleasanton.   In 2014, however, Safeway spun off Blackhawk.  Today, Blackhawk is owned by Silver Lake, a private equity firm, ***also*** based in the San Francisco Bay Area.

57.    In the open-loop prepaid card space, InComm and Blackhawk compete by vying for contracts to place their respective products at retailers.  InComm enjoys

placement of Vanilla Cards at many top national retailers, including Blackhawk's former parent, Safeway.

## II.    The Evolving Threat of Gift Card Fraud

### A.    The Prevention of Package Tampering

58.    InComm and Blackhawk, though fierce competitors, face a common enemy in third-party fraudsters.  As with most financial-services products, for as long as open-loop gift cards have been in market, criminals have been seeking ways to steal the cards' balances.  As these wrongdoers have deployed new fraud techniques over the years, InComm has correspondingly adapted its security measures to remain one step ahead.  Thanks to the success of these measures, fraud affects only a minuscule percentage of the millions of Vanilla Cards that InComm distributes and services each month.

59.    Fraudsters seek out open-loop gift cards for the same reason as gift-givers: they are drawn to the cards' anonymity and easy transferability.  Neither InComm nor a retailer accepting Vanilla Cards can verify (or even know) the rightful cardholder's identity at the point of redemption.  As a result, anyone who has the card's 16-digit number, CVV, and expiration date can spend the card's balance, especially when shopping online.  So fraudsters look for ways to illicitly acquire this card information to try and steal the balance out from under the cardholder.

60.    InComm, like any responsible provider of payment cards, must remain attuned to the methods that criminals use to commit fraud to stay one step ahead of them.  Through this vigilance, InComm has become aware of package tampering as one way that criminals try to obtain card data.

61.    To execute this form of fraud, criminals steal gift cards from retail stores, breach the packaging of a not-yet-activated card, examine and record the card information, reseal the packaging, return the card to a store rack, and wait for the card to be activated, i.e., loaded with funds that the fraudsters can then try to steal. For many years, InComm has applied robust security measures throughout the card lifecycle to minimize the occurrence of this form of fraud.  Some of these measures are closely guarded company secrets, but a few commonly-known ones are listed below.

62.    *Packaging Security*.  Vanilla Cards are packaged between two opaque cardboard panels that are glued together around the perimeter, and can be opened by a pull tab that rips one panel entirely in half, as shown in the photo below:



63.    InComm also secures the packages in other ways, including its patented technique of "splitting" the card activation barcodes between the packaging and the card itself, so that the slightest misalignment of the card within the package will render the card inoperable:

23



Many card packages are also equipped with features like perforated tear strips, inner security slits, and security labels designed to make any evidence of pre-purchase tampering visible prior to purchase.

64.    *Point of Activation Security*.   Any attempted use of a card's 16-digit number **before** the card is activated—including by querying the card's balance or attempting a purchase—is a red flag for tampering fraud.   No legitimate consumer would have occasion to check a card's balance prior to purchase.   Accordingly, InComm's systems automatically flag—and render inoperable—any card whose

24

number is entered before activation. These measures ensure that no consumer will get stuck buying a card that shows clear signs of having been compromised.

65.    *Post-Activation Security*. Even after a card is activated, InComm's systems monitor user activity on vanillagift.com and expenditures of the card balance. Suspicious activity patterns on either front may trigger a "freeze" of the card for security purposes.

66.    InComm's prodigious investment in security is not just the right thing to do for consumers; it is also smart business. Fraud is a drain, financial and otherwise, on InComm's operations. Verifying a fraud complaint involving an anonymous card is a complex and costly process, particularly since such complaints may themselves be fraudulent. The costs are compounded when InComm determines, as it often does, that compensating the consumer is the appropriate solution. As a result, every Vanilla Card that becomes the subject of a fraud complaint represents a significant net loss for InComm.

67.    There are also more intangible costs of fraud. Consumers who find that their card balances have been stolen out from under them are, understandably, upset. Equally understandably, they are eager to receive redress and impatient with InComm's necessary investigative process. Sometimes, consumers express their frustration in online consumer reviews or share it with their local news stations. But when the same consumers later obtain refunds, they rarely if ever return to amend

their original reviews.  And consumers who never encounter any trouble with their cards—which is to say the vast majority of Vanilla Card consumers—are unlikely to review the products at all.

68.    As a result, isolated occurrences of fraud—though exceedingly rare as a percentage of InComm's total portfolio—are disproportionately represented in consumer reviews and other consumer accounts of Vanilla Cards.  This can create a misleading impression of the products' functionality and susceptibility to fraud.

69.    To be clear, InComm is not aggrieved by any of this.  Consumers have every right to be frustrated when their money is stolen, and to share their experiences however and wherever they choose.  The result, however, is that even occasional occurrences of fraud have the potential to erode consumer confidence in Vanilla Cards.  The profitability of Vanilla Cards depends heavily on nationwide volume of sales—which, in turn, depends on InComm's ability to consistently earn consumers' and retailers' trust.  For these reasons, when it comes to fraud, an ounce of prevention is worth a pound of cure.

**B.    The Emergent International Money-Laundering Organizations**

70.    Despite these investments in preventative security, the past two years have yielded new challenges with fraud activity on both closed-loop[4] and open-loop gift cards across the industry, due to the efforts of money laundering organizations based primarily in China.

71.    This fraud has impacted InComm, Blackhawk, and many well-known brands and retailers, including, among others, Amazon, Apple, DoorDash, Foot Locker, Home Depot, Sephora, and Kroger.

72.    Documents made public in the resulting criminal investigations reveal that gift card fraud is not the result of petty theft, but rather, in recent years, of these highly organized criminal operations.

73.    The typical card-fraud operation, as described in a recent publication by the U.S. Department of Homeland Security, follows a hierarchical scheme.  First, "takers" steal large quantities of inactive gift cards from retail stores. The "takers" then ship the stolen gift cards to "tamperers" who are specially trained to extract the gift cards from their packages and record valuable card data—in the case of Vanilla

---

[4] In contrast to an open-loop gift card, a "closed-loop" card can be redeemed only for purchases from a specific retailer or vendor.  Store-specific or restaurant gift cards are examples of closed-loop cards.

Cards, the 16-digit card numbers, expiration dates, and CVVs.[5]  Then the tamperers carefully replace the cards and reseal the packages so as to conceal evidence of tampering.

74.    Next, the tampered gift cards are sent to "placers" who put the tampered gift cards back onto retail displays.  "Checkers" then try to pin down when the cards are activated and funds become available.  They, in turn, pass that information on to "acquirers," who use it to purchase high-value consumer goods or other gift cards.

75.    Thanks to card security measures, the "checkers" phase of the operation requires precision timing.[6]  If the "checkers" ping the balance of a card too early (either by checking the balance or attempting to redeem), and it has not been activated yet, many providers—including InComm—will automatically disable the card.  But if the "checkers" wait too long, the legitimate cardholder may have already used the funds loaded on the card.

76.    Because the checkers inevitably miss this window of opportunity in many cases, the criminal organization works only at scale: the criminal organizations

---

[5] U.S. Immigration and Customs Enforcement, *Chinese Money Laundering Organizations (CMLOs) Abuse of Gift Cards* (June 3, 2024), https://content.govdelivery.com/accounts/USDHSICE/bulletins/39f302a.

[6] C. Steven Baker, *Gift Card Payment Scams*, Better Bus. Bureau (Mar. 2021), https://www.bbb.org/content/dam/0734-st-louis/gift-card-study-creatives/giftcardscamstudy.pdf.

must steal many cards for their fraud to pay off.  So that is just what they do.  Recent criminal prosecutions have revealed that the "takers" and "placers" drive thousands of miles a day, gathering thousands of cards for tampering, and then replacing the cards on store shelves after they have been compromised.[7]

### C.    The Sophistication of the Current Threat

77.    In the two-year period since these coordinated criminals arrived on the scene, InComm has gathered data about their operations, analyzed fraud complaints from cardholders, and used this information to update its security at the pre-activation, activation, and redemption stages.[8]    Though no company has yet

---

[7] The criminal activity described above is the most common form of gift card fraud, but not the only one.  For example, some criminals "clone" gift cards by re-coding an un-activated gift card's barcode to match an entirely different gift card, such that when a customer purchases the tampered card, the gift card in possession of the criminal, rather than the tampered card, is activated and loaded with funds. *See, e.g.*, Media Release, City of Colleyville, Tex., *Gift Card Crime Ring Indicted for Engaging in Organized Criminal Activity Linked to Colleyville Victim* (Jan. 23, 2024), https://www.colleyville.com/Home/Components/News/News/703/18?arch=1&npage=6.  InComm's robust security measures have, however, dramatically reduced the occurrence of this form of fraud—known as "card swapping"—on Vanilla Cards.

[8] *See US Senate hearing addresses gift card fraud schemes*, VOA News (May 2, 2024), https://www.voanews.com/a/us-senate-hearing-addresses-gift-card-fraud-schemes-/7595726.html (reporting that the United States arrested over 100 individuals in connection with gift card fraud in the preceding 18 months and that many were connected to transnational criminal organizations, many of which appear to be based in China).

eliminated fraud, InComm is confident that its measures are deterring widespread fraud attempts from even highly sophisticated actors.

78.    Getting a handle on the current iteration of the fraud threat has involved close partnership between law enforcement and industry actors such as InComm. Fortunately, law enforcement professionals across the country have come to recognize the scale and complexity of the problem, and the urgent need to address it.  To date, InComm has worked with numerous district attorneys' offices across the country on investigations and/or prosecutions of the perpetrators.

79.    The federal government has also become engaged in the issue, and has stepped in to coordinate these efforts.  The Department of Homeland Security ("DHS") recently launched the Project Red Hook initiative to address "the [r]ise in [g]ift [c]ard [f]raud."[9]  The Project's website announces that gift card fraud is a "growing concern," and that HSI  is "teaming up with our law enforcement partners and businesses to raise awareness of how Chinese organized crime groups are exploiting gift cards to launder money."[10]

---

[9] Homeland Security Investigations, *Tackling the Rise in Gift Card Fraud*, Dep't of Homeland Security (Aug. 23, 2024), https://www.dhs.gov/hsi/insider/tackling-gift-card-fraud.

[10] *Id.*

80.    HSI has also offered its assistance to state prosecutors hoping to hold gift card fraud perpetrators accountable.    The agency offers "knowledge and resources that can assist in tracking down these organized crime groups, gathering crucial evidence and coordinating investigations across jurisdictions."

81.    And to be sure, state-level prosecutions have proliferated.    Between January 2023 and mid-2024, more than 100 perpetrators were arrested, and many also prosecuted, for gift card theft and related criminal activity.[11]

82.    This coordinated mobilization by law enforcement is commensurate with the sophistication and scale of the fraud activity.    DHS Assistant Special Agent William Crogan has described present-day gift card fraud rings as "very organized."[12]    Likewise, the special agent in charge of the FBI field office in San

---

[11]Craig Silverman and Peter Elkind, *Chinese Organized Crime's Latest U.S. Target: Gift Cards*, ProPublica (Apr. 10, 2024), https://www.propublica.org/article/chinese-organized-crime-gift-cards-american-retail; Madeline Hubbard, *Chinese organized crime increasingly becomes an issue in the US*, Just the News (June 20, 2024), https://justthenews.com/nation/crime/chinese-organized-crime-increasingly-becomes-issue-us.

[12] Tim Callery, *Police Warn New Hampshire Consumer of Scam Involving Gift Cards*, WMUR 9 ABC (July 16, 2024), https://www.wmur.com/article/new-hampshire-scam-gift-cards-warning-71624/61583534.

Francisco, Robert Tripp, described gift card fraud as a "major problem," stating that it is "very much an international issue."[13]

83.    Local law enforcement investigating gift card fraud have had similar reactions.    For example, the Sacramento Deputy District Attorney Adrienne McMillan told reporters, "[t]he way that [gift card fraud] is done is very sophisticated."[14]    The Sacramento Sheriff's Detective Andy Cater similarly stated that gift card fraud operations are "fairly organized and have some financial backing to operate a large scale operation."[15]    Detective Cater described the gift card fraud as "overwhelming" due to its large scale and sophisticated organization.[16]    The Santa Clara District Attorney's Office issued a press release warning consumers about this

---

[13] Chris Chmura and Alyssa Goard, *He had 5,000 gift cards. Prosecutors allege 'sophisticated' scam, FBI warns of 'untraceable cash'*, NBC Bay Area (Feb. 23, 2024), https://www.nbcbayarea.com/investigations/consumer/draining-gift-cards-scam/3461757/.

[14] Chris Chmura, *et al.*, *A syndicate is draining billions from gift cards; a new federal operation aims to stop the scam*, NBC Bay Area (May 21, 2024), https://www.nbcbayarea.com/investigations/consumer/gift-card-scams/3544673/.

[15] *Id.*

[16] Chris Chmura, *et al.*, *'There's no money on it': What's behind vanishing gift card balances*, NBC 5 DFW (May 21, 2024), https://www.nbcdfw.com/news/nbc-5-responds/gift-card-balance-stolen/3547004/.

method of gift card fraud as well, describing it as a "prolific scheme" carried out by "organized criminal networks."[17]

84.    These expert assessments regarding the sophistication of gift card fraudsters reflect that the entire industry, not just InComm, must contend with this threat.  These analyses also demonstrate that fraud is in no way "unsophisticated" or a function of one company's "inadequate" security.

85.    These facts are borne out still further by the information that has emerged from prosecution of these cases.  For example, in June 2023 in Alachua County, Florida, two defendants—Cheng Li and Jiaxin Jiang—were arrested during a traffic stop and found to have more than 1,700 cards in their possession.[18]  Their GPS data showed that they had visited nearly 50 stores to collect the cards, and further investigation revealed that they were involved in a money laundering cell, to which they provided both stolen cards and information about card activation.  For both defendants, this criminal activity was the equivalent of a full-time job.

---

[17] News Release, County of Santa Clara, Office of the District Attorney, Santa Clara DA: Be wary of store-bought gift cards (Oct. 16, 2024), https://da.santaclaracounty.gov/santa-clara-county-da-be-wary-store-bought-gift-cards.

[18] Staff Report, *Pair arrested with 1,764 fraudulent gift cards, may be part of organized ring*, Alachua Chron. (June 8, 2023), https://alachuachronicle.com/pair-arrested-with-1764-fraudulent-gift-cards-may-be-part-of-organized-ring/.

86.    The scale of the activity warranted serious criminal charges.  They were ultimately indicted on fraud, larceny, and conspiracy charges; after one pled guilty to grand larceny, and the other was found guilty of organized fraud and conspiracy to commit organized fraud, they were sentenced to 15 and 20 years' imprisonment, respectively.[19]

87.    The Florida case is just one example of this type of prosecution.  In New Hampshire, four individuals—Mengying Jiang, Naxin Wu, Mingdong Chen, and Jinbin Ren—were arrested between December 2023 and June 2024 for their role in a "complex scheme" involving stealing several million dollars' worth of gift cards, primarily from Walmart and Target.[20]   All four have now been indicted.[21] Separately, three other individuals—Huihuang Zheng, Guoxin Zheng, and Fangqun Zhong—were also later arrested in New Hampshire and now face prosecution.[22]  Per

---

[19] *See generally State v. Cheng*, No. 2023 CF 001808A (Fl. Cir. Ct. Alachua Cnty. 2023); *State v. Jiang*, No. 2023 CF 001808B (Fl. Cir. Ct. Alachua Cnty. 2023).

[20] Tony Schinella, *Million Dollar Gift Card Scam Operation*, Patch (Mar. 26, 2024), https://patch.com/new-hampshire/concord-nh/did-concord-police-help-bust-multi-million-gift-card-scam-operation; Tony Schinella, *Gift Card Theft Scam: Superior Court Roundup*, Patch (July 23, 2024), https://patch.com/new-hampshire/concord-nh/4th-person-indicted-multi-million-gift-card-scam-court-roundup.

[21] Schinella, *Gift Card Theft Scam, supra* note 20.

[22] Tim Callery, *New Hampshire judge orders man allegedly linked to international gift card theft ring be held on $500,000 bail*, WMUR 9 ABC (July 16, 2024), https://www.wmur.com/article/concord-new-hampshire-theft-ring-huihuang-

prosecutors, Defendant Huihuang Zheng is part of "a group of people who have carried out an elaborate gift card scheme in New Hampshire and across the country."[23]

88.    Federal authorities have also prosecuted gift-card fraud cases in an effort to neutralize this activity.  The U.S. Attorney for the Northern District of West Virginia charged Yasmany Roque Cruz with possession of counterfeit and unauthorized access devices with intent to defraud after he was apprehended by state police and found in possession of 748 altered and un-altered gift cards.[24]  At the time, Cruz was also under state investigation in Florida for purportedly laminating copies of barcodes and serial numbers used to alter and repackage tampered gift cards.[25]  Cruz pled guilty to a federal charge of access device fraud and agreed he intended to cause a loss of approximately $374,000; he now faces 10 years in prison.

---

zheng/61616332; Tony Schinella, *Another New Yorker Arrested on Concord Gift Card Felony Theft Charge*, Patch (Apr. 1, 2024), https://patch.com/new-hampshire/concord-nh/another-new-yorker-arrested-concord-gift-card-felony-theft-charge.

[23] Callery, *supra* note 20.

[24] Press Release, U.S. Attorney's Office, N.D. W.Va., *Florida Man Admits to Operating a Gift Card Draining Scam* (Oct. 24, 2024), https://www.justice.gov/usao-ndwv/pr/florida-man-admits-operating-gift-card-draining-scam.

[25] *United States of America v. Cruz*, No. mj-00041-JPB-JPM, Aff. in Support of Crim. Compl., ECF 1-1 (N.D.W.V. June 14, 2024) ¶ 13.

89.    As this sampling of recent arrests and prosecutions demonstrates, authorities across the country are working hard to combat the elaborate criminal enterprises focused on defrauding all manner of gift cards.

90.    This sampling also reflects that gift card theft and fraud impacts all gift card companies and products across the industry.  Both InComm and its primary competitor, Blackhawk, have seen their products targeted by this criminal enterprise.  For example, a reporter in Texas recently documented almost 40 instances where cardholders complained that they purchased Visa gift cards serviced by Blackhawk on Amazon, only to have the funds they loaded onto their cards stolen by criminals.[26]

91.    Similarly, last month, police in Louisville, Kentucky caught four individuals engaged in gift card tampering at Kroger, a retailer whose gift card business is serviced by Blackhawk.  The suspects had gift cards in their possession from stores in four states, with a total face value of more than $1 million.  The police recognized the crimes as part of an "organized crime scheme impacting people

---

[26] Ginger Allen, *Customers say their Amazon Visa gift cards are "compromised,"* CBS News Texas (Dec. 20, 2023), https://www.cbsnews.com/texas/news/customers-say-their-amazon-visa-gift-cards-are-compromised/.

across the country," and "***encourage[d] shoppers to be vigilant when buying gift cards from Kroger*** [or] other . . . retail chains."[27]

92.    Similarly, in Santa Clara County, two individuals were arrested after being caught putting tampered cards back on store shelves, all of which are serviced by Blackhawk, and were found with over 500 stolen gift cards from Apple, Amazon and Home Depot.[28]   These episodes, among others, demonstrate that the gift card threat is not unique to Vanilla Cards or InComm-serviced products (and, contrary to Chiu's assertions, cannot be neutralized by avoiding those products).

93.    Nor is the impact limited to open-loop gift card or fintech companies. On the contrary, as described above, many well-known brands and retailers have also been affected through targeting of their closed-loop cards.[29]

---

[27] Madeline Carter, *St. Matthews police uncover massive gift card scam worth estimated $1M; 4 men arrested*, WLKY (Oct. 21, 2024), https://www.wlky.com/article/men-arrested-gift-card-scam-louisville-millions-lost/62673181 (emphasis added).

[28] Carlos Castañeda, *Gift card scam suspects from Southern California arrested in Santa Clara County*, CBS News Bay Area (Aug. 21, 2024), https://www.cbsnews.com/sanfrancisco/news/campbelll-gift-card-scam-suspects-southern-california-santa-clara-county/.

[29] *See, e.g.*, Diana Zoga, *et al.*, *'There's no money on it': What's behind vanishing gift card balances*, NBC 5 DFW (May 21, 2024), https://www.nbcdfw.com/news/nbc-5-responds/gift-card-balance-stolen/3547004/ (reporting on fraud at many of these brands and retailers); News Release, County of Santa Clara, *supra* note 17, (embedding video of public service announcement from the Santa Clara County DA's office with examples of tampered Home Depot cards).

### D.    InComm Has Partnered Closely With Law Enforcement and Adapted Its Security Measures

94.    InComm has served as an active partner in these law-enforcement efforts, and has also worked to adapt its own security to the threat presented by fraud rings.  Through this public-private partnership, InComm has diminished the threat presented to its cardholders by these criminal organizations.

95.    As HSI references on its Project Red Hook site, private-sector stakeholders are heavily involved in that effort.[30]  HSI has convened periodic Fraud Summits of this coalition, which InComm has attended, along with Blackhawk and a number of top nationwide retailers.  The summits' participants exchange their observations about trends in gift card fraud, as well as strategies for prosecuting and preventing it.  InComm also provided a training to the Orange County Economics Crime detectives in California on how to handle evidence of gift card tampering, including physical examples of tampered cards.

96.    Moreover, InComm routinely helps local law enforcement identify fraudulent gift card activity when they apprehend a suspect connected to a gift card scam.  This assistance from InComm has been critical to bringing wrongdoers to justice and holding them accountable for their crimes.  For example, InComm provided essential support to Ohio law enforcement in their prosecution of Ming

---

[30] Homeland Securities Investigations, *supra* note 9.

Xue, a low-level participant in a gift-card-driven money laundering scheme. InComm aided the investigation by, among other things, using shipment data to confirm that the fraudsters were responsible for transporting the cards across state lines.[31] InComm also conceived of an operation to activate a small sample of the confiscated cards, which allowed prosecutors to observe that the cards were being spent by a separate operative in California—thus revealing valuable information about the operations' scope.[32]

97.    At the same time that InComm has assisted law enforcement in holding fraudsters accountable, it has worked to reduce the impact of their crimes on its own consumers.  For example, InComm has put in place many additional anti-fraud measures throughout the card life cycle:  from packaging to activation to querying to redemption.  Though no industry player has entirely eliminated fraud, InComm's surveillance indicates that these measures thwart fraud attempts in large numbers.

98.    Indeed, during a single week leading up to Christmas 2023, two anti-fraud measures that InComm deploys at the activation stage successfully averted the activation of more than **6,000** potentially compromised cards.  And even on the rare

---

[31] *Ohio v. Ming Xue*, No. 23 CR 0100, State's Resp. to Def. Mot. to Suppress (Ohio Ct. Com. Pl. Coshocton Cnty. Mar. 5, 2024), at 7–8.

[32] *Id.* at 8; *see also Ohio v. Ming Xue*, No. 23 CR 0100, State's Mot. in Limine to Permit Evidence of InComm Business Records (Ohio Ct. Com. Pl. Coshocton Cnty. Feb. 7, 2024).

occasions when potentially compromised cards are activated, anti-fraud measures at later points in the cycle can still protect consumers from being victimized.

99.    In addition, InComm has worked to make it easier for consumers to seek redress on the rare occasions they encounter suspected fraud.  For example, rather than requiring consumers to call its toll-free number, InComm now provides an online form for reporting suspicious activity.  InComm also allows consumers who have submitted complaints to track the progress of the company's investigation using an online portal.

100.    As InComm's work in this area demonstrates, InComm is a *victim* of gift card fraud and a *partner* with the law in combating it.  This much is obvious to every lawman in the country—with one notable exception.

## III.    Instead of Working with InComm to Safeguard Consumers, the San Francisco City Attorney Has Arbitrarily Made InComm a Scapegoat

101.    While every other law enforcement agency investigating gift card fraud has enlisted InComm to help catch criminals, the SFCAO decided to go the opposite route—wielding its power to publicly attack InComm, and only InComm, as the wrongdoer.  On November 9, 2023, Defendants sued InComm and three banks that service InComm's Vanilla Cards—TBBK Card Services Inc., Sutton Bank, and Pathward, N.A in the Superior Court of California, San Francisco County.

102.    According to Defendants, the responsibility for the occurrence of gift card fraud lies not with the criminals who commit it, but with InComm.  The complaint ("Compl.") proclaims that "Card draining, which can occur in multiple ways, is a relatively unsophisticated crime made possible by In[C]omm's inadequate security," Compl. ¶ 50, and that "Funds are easily stolen from nonreloadable Vanilla debit cards as a result of In[C]omm's insufficient security and its knowing failure to improve it."  *Id.* ¶ 56.

103.    On this basis, Chiu purported to sue InComm for violations of the UCL, on behalf of the "People of the State of California."  *Id.* ¶¶ 118–124.

104.    The suit came as a surprise to InComm, as the SFCAO had never previously expressed interest in gift card fraud and indeed had never reached out to InComm or (to InComm's knowledge) any of its retail partners.  InComm was also dismayed by the SFCAO's decision to badly mislead consumers about the causes and prevention of gift card fraud, just as the holiday season approached and many consumers were potentially vulnerable to fraud activity.

105.    Based on the complaint, it quickly became clear that Defendants knew little about gift card fraud or InComm's efforts to combat it.  Defendants were just looking to InComm for quick cash and to give InComm's Bay Area rival a competitive boost.

### A.    The SFCAO's Failure to Conduct a Minimal Factual Investigation

106.    By pointing the finger at InComm, the SFCAO made itself an outlier, to put it mildly.    The SFCAO's description of gift card fraud as "a relatively unsophisticated crime made possible by In[C]omm's inadequate security"[33] broke sharply with the conclusions of law enforcement agencies nationwide that have closely studied, investigated, and prosecuted gift card fraud.

107.    Before taking such a bold and aberrational stance, one would expect the SFCAO to conduct an exhaustive investigation.    That did not happen.    In fact, the complaint and the SFCAO's subsequent conduct have evidenced almost no investigation.    Some revealing examples of the SFCAO's abject failures of diligence are set forth below.

108.    *No Consumer Engagement*.    Although the SFCAO's suit purports to seek redress for InComm's harm to "numerous consumers" statewide,[34] there is no indication that the SFCAO has ever identified or communicated with any such consumers.    The complaint does not describe any consumer experiences, but recopies a series of largely anonymous internet reviews, with no indication that the SFCAO verified any of them.

---

[33] Compl. ¶ 50.

[34] *Id.* ¶ 4.

109.    In the year since the SFCAO filed suit, InComm has repeatedly pressed the office for information about any aggrieved California consumers—primarily so that the company can investigate and, if necessary, take corrective action.  InComm has repeated this inquiry in several discovery-related communications between July and November 2024.  And in September 2024, InComm's counsel sent a Public Records Request to the SFCAO seeking the same information.  To date, Defendants have provided nothing—no information about any consumers affected by the alleged fraud.  Accordingly, InComm can only conclude that Defendants sued for consumer fraud without bothering to find any actual instances of consumer fraud.

110. *No Inquiry With Other Knowledgeable Persons or Entities*.  The SFCAO also does not appear to have engaged with anyone else who could offer a firsthand understanding of gift card fraud.  InComm never received an investigative demand or other inquiry from the SFCAO before the suit was filed.  Had anyone from the office reached out to InComm, even informally, InComm would have willingly provided information, as it has to other government agencies.  But nobody did.  Nor does the SFCAO claim to have obtained information from issuing banks, law enforcement officers, independent fraud experts, credit card networks, or money transmitter licensing boards.  Rather, the SFCAO seems to have developed its aberrational theory about the causes of gift card fraud without input from anyone with knowledge of that subject.

111.  *No Firsthand Product Investigation*.  Even more tellingly, the SFCAO did not take advantage of readily-available means of testing its allegations.  The crux of the claim is that Vanilla Card packaging is "inadequate" and that, as a result, Vanilla Cards are "easily" breached by "unsophisticated" criminals.  In essence, the SFCAO contends that any fool can breach InComm's packaging "without displaying obvious signs of tampering" and obtain the card data necessary to commit fraud.[35]

112.   Yet the complaint does not answer one obvious question: ***how?***  As the complaint depicts, Vanilla cards are sealed between two opaque cardboard panels, which are glued together and must be opened with a pull tab that rips one of the cardboard panels in half.[36]  It is not obvious how to access the card "without displaying obvious signs of tampering," and the complaint does not explain.

113.   Nor does the complaint reference any other firsthand observation of the "easy" breach of Vanilla Card packaging.  The complaint does not recount any instances in which anyone successfully breached the packaging without leaving signs of tampering.  And it does not depict any Vanilla Card packages that have purportedly been tampered with but bear no visible signs.

---

[35] Compl. ¶¶ 50, 56–59.

[36] *Id.* ¶ 34.

114.   This is a striking omission.  After all, Vanilla Card packaging is not hard to find:  the products are sold throughout San Francisco, including at a retailer more or less across the street from Chiu's office.  Acquiring a few cards, and performing the "easy" task of breaching the packaging, should have been the office's very first act in developing the case.  Instead, by all appearances, the SFCAO filed a complaint alleging that Vanilla Card packaging was easy to breach without trying to determine whether Vanilla Card packaging was actually easy to breach.  This is a stunning and inexcusable failure of diligence.

115.   *Inaccurate and/or Nonsensical Allegations*.  The SFCAO's failure to investigate is also apparent from the preponderance of allegations in its complaint that are demonstrably wrong, make no sense, or both.  For example, the complaint alleges that once a criminal has breached InComm's packaging and accessed the 16-digit number, he uses that number to monitor the balance on InComm's website and track when the card is activated.  The SFCAO alleges that although a balance check for an un-activated card is a red flag for fraud, "In[C]omm neither monitors Vanilla's website to track this [suspicious activity], nor uses this information to prevent compromised Vanilla cards from being sold to consumers."[37]

---

[37] *Id.* ¶ 55.

116.   That is just wrong.  As set forth above, InComm's systems do exactly that.  This has been the case for years and has been noted in publicly available sources.[38]  Indeed, the criminal organizations engaged in gift card fraud know this, and try to work around it.  The SFCAO's willful ignorance of this fact, in a complaint that purports to offer a theory about the causes of gift card fraud, is remarkable.

117.   In another display of ignorance, the SFCAO disparages Vanilla Card packages by describing them as "thin cardboard sleeves."[39]  In fact the packages are not "sleeves" at all, since a "sleeve" has an open edge and the Vanilla Card packaging is sealed by glue all the way around.  Also, the SFCAO's suggestion that "thin cardboard" connotes insecurity is entirely wrong.  The thinner the cardboard, the more likely it is to show visible signs of tampering after the packaging is breached.  For that reason, one of InComm's security improvements in the wake of the recent fraud threat has been the introduction of a package with even ***thinner*** cardboard.  But this is just one more thing the SFCAO did not attempt to understand before filing suit.

---

[38] *See* C. Steven Baker, *supra* note 6 at 15.

[39] Compl. ¶¶ 34, 57.

**B.    The SFCAO's Pretextual Focus on InComm**

118.    Though the SFCAO is hardly the first government office to file an overzealous complaint with allegations it could never prove, the failures of its investigation of the case against InComm are of an exceptional order, and suggest a lack of good-faith effort.

119.    However, even these might have been chalked up to run-of-the-mill poor lawyering had the SFCAO's complaint blamed the entire prepaid card industry, including InComm's competitors, for the occurrence of fraud.  Instead, it put a decisive thumb on the scale against InComm and in favor of its competitors.

120.    The complaint offers no justification for that partiality.  Its cursory attempts to distinguish InComm from its competitors are so unpersuasive, and illogical, as to be plainly pretextual.  The SFCAO decided to make InComm the bad guy first, and came up with its allegations later.

121.    The complaint contends that InComm's competitors have done a better job "increas[ing] the security of their cards" through packaging design than InComm has.[40]  Of course, the complaint also contains no actual information about the "security" of InComm's, or anyone else's, cards.  It does not provide data about the relative occurrence of fraud involving different prepaid products.  Nor does it

---

[40] Compl. ¶ 59.

provide facts about the relative "ease" with which different card packages can be breached.

122.   Instead, it serves up a few images from around the internet of other products that it describes as "prepaid cards," and observes that those products' packages have attributes that the packaging of Vanilla Cards does not have.  But any casual observer can see that the comparative packages the SFCAO highlights are *less* secure than Vanilla Card packaging, and are inappropriate bases of comparison in any event.

123.   *Transparent Plastic Shells*.  For example, the SFCAO suggests that InComm should try packaging its Vanilla Cards in a transparent plastic shell, rather than the fully sealed opaque cardboard that it currently uses.[41]  Why a transparent package would secure the card information more effectively than an opaque one, the SFCAO does not say.  And in point of fact, unlike the sealed panels of Vanilla Card packaging, transparent plastic shells can be partially separated from the cardboard, then snapped back into place, without leaving signs of tampering.  Thus, the SFCAO's contention that these packages are more secure than Vanilla Card packaging is incorrect.

---

[41] Compl. ¶¶ 60–62.

124.   There is, however, a valid reason for the reduced security of these products' packaging.  As the SFCAO notes, the plastic shell packaging is used for "reloadable" prepaid debit card products.  These products must be registered to a user and account before funds can be accessed, a fact that makes them a vastly less attractive target for package tampering than the anonymous Vanilla Cards.

125.   At the same time, because consumers often purchase these products to use as debit cards on an ongoing basis, they typically prefer to see the cards' appearance before making a selection.  By contrast, the non-reloadable Vanilla Cards are used only on a short-term basis, so it is less important to consumers to view the cards before purchase.  The plastic shell packaging is also designed to accommodate the lengthier written disclosures that accompany a reloadable card.

126.   In short, the plastic-shell packaging is designed with different considerations in mind than the Vanilla Card packaging, making it an improper basis of comparison.  And contrary to the SFCAO's claims, its packaging is not more secure than Vanilla Card packaging; rather, it is designed to be best-suited to the product for which it was developed.

127.   *Scratch-Off Coating for PIN.*  Next the SFCAO touts two packaging designs on which, according to the SFCAO, the "cards are packaged in a cardboard sleeve with a silver coating on the back that conceals the sixteen-digit card number."

Per the SFCAO, this enhances security because scratch marks on the silver coating "would reasonably notify a consumer . . that the card has been tampered with."[42]

128.   The SFCAO's assertions about these products are incorrect in every particular.  For starters, the depicted products are not "prepaid cards" at all.  They are pieces of cardboard bearing PINs, which can be used by consumers who already have reloadable prepaid cards to add funds to their prepaid card accounts.  The SFCAO's erroneous characterization of these products as "cards" confirms that the SFCAO *did not even bother to examine these product packages before declaring them more secure than InComm's*.

129.   In addition, the SFCAO's assertions about the scratch-off silver coatings are just as nonsensical as its assertions about the transparent plastic shells. Scratch-off silver coatings are highly breachable.  A fraudster need only replace tampered coatings with new scratch-off silver coatings, which are inexpensive and widely available; indeed, one can purchase hundreds of scratch-off silver coatings on Amazon for less than $10.  And if a fraudster successfully scratches off the silver coating, an unassuming consumer who did not know there was supposed to be a coating to be scratched off in the first place would be none the wiser.

---

[42] Compl. ¶¶ 62–64.

130.   This low-security packaging reflects the fact that these "reload" codes can be used only to add money to a designated, pre-existing reloadable prepaid card account, making them less attractive targets of package tampering than Vanilla Cards.  Like the plastic shell packages, packages using scratch-off coatings are *less* secure than the Vanilla Card packages, and a poor basis of comparison.

131.   *Blackhawk*.  Finally, the SFCAO draws an invidious comparison with InComm's Bay Area-based competitor, Blackhawk.  The complaint depicts an image of packaging allegedly used for Blackhawk's non-reloadable prepaid Visa gift cards. The Blackhawk packaging features a "small tear-away cardboard strip" covering the activation barcode, as well as a "hologram sticker" on which the cashier is instructed to look for signs of tampering.[43]  According to the SFCAO, these innovations stop "[w]ould-be card drainers" in their tracks.

132.   This is more logical than the SFCAO's other two comparative pronouncements, in that it at least involves an analogous product to Vanilla Cards— an anonymous open-loop card.  But that is where the logic ends.  To begin with, the SFCAO's praise for Blackhawk's "tear-away cardboard strip" is a head-scratcher, given that the Vanilla Card packaging *also* features a tear-away pull tab on its back

---

[43] Compl. ¶¶ 65–66.

panel.  The primary difference is that the Vanilla Card tab covers the full length of the panel, whereas the Blackhawk tab covers only a portion.

133.   Another shortcoming of the SFCAO's Blackhawk comparison is, once again, that the SFCAO made it without bothering to look at the packaging in question.  The Blackhawk packaging image in the complaint was lifted from a 2022 post by an obscure "travel and fitness blogger," with no apparent expertise in gift card packaging or fraud.[44]  Based solely on these blogger's amateur photos of a gift card package, the SFCAO pronounced Blackhawk's packaging more secure than InComm's.  (Evidently, the SFCAO did not feel compelled to gauge the "thinness" of the cardboard Blackhawk uses, or otherwise test the package's efficacy at deterring fraud.)

134.   Indeed, to the extent any conclusion can be drawn from the online image of Blackhawk's packaging cited in the SFCAO's complaint, it is that Blackhawk has faced the same threat of package tampering fraud as InComm.  That is why Blackhawk's packaging has evolved to be broadly similar to InComm's:  two sealed opaque cardboard panels, with markers designed to show signs of tampering (e.g., the split barcode used by InComm, and the holographic sticker used by Blackhawk).  But rather than accounting for these common-sense inferences, the

---

[44] Compl. ¶¶ 61–62, n.24.

SFCAO pulled an image of Blackhawk's package online and glibly proclaimed it more secure than InComm's, with no factual support.

135.   These are fundamental failures of investigation and pleading by highly sophisticated attorneys.  It surely occurred to the SFCAO that they could, and by all rights should, marshal comparative data before drawing a comparison between InComm and its competitors.  Similarly, it surely occurred to them that they could speak with affected consumers or with other entities who have dealt directly with card fraud, or that they could test out the ease of gift card package tampering for themselves.  But based on their complaint, it appears that they did none of these things.  These basic lapses suggest that they were indifferent to the merits of their case, and were instead driven to file it by ulterior motives.

## IV.    San Francisco's Suit Against InComm is an Improper Effort to Generate Local Revenue and Serve Other Parochial Interests

136.   What really motivated Defendants, it seems, was a desire to bring a windfall to their hometown in troubled times.  They anticipated that the suit would offset severe budget shortfalls of the City and the SFCAO in particular.  The suit also conferred potential benefits to InComm's primary competitor, Blackhawk, a company with deep Bay Area roots.  Even better, the UCL gave the SFCAO a fig leaf to disclaim these parochial interests and claim to act on behalf of the State's consumers.  In this way, they avoided removal to a federal forum.

137.   These ulterior motives are apparent in part from the flimsily pretextual nature of Defendants' suit, discussed above.   They are also evident from the SFCAO's own public statements about the capacity of UCL suits to solve its fiscal woes.   And they can be inferred from numerous surrounding circumstances:  the broad discretion of the SFCAO's affirmative litigation unit to bring cases of its choosing; the incentives created by the City Attorney's UCL enforcement power; the City's dire financial circumstances; Defendants' apparent favoritism toward Blackhawk; and Defendants' highly misleading statements when evading removal.

### A.   The Unfettered Discretion of the SFCAO's Affirmative Litigation Unit

138.   SFCAO lawyers have very few constraints on their freedom to develop, investigate and pursue civil litigation.   This hands-off attitude comes from the top down.   Per the San Francisco Municipal Code, Section 2A.231, the City Attorney enjoys broad subpoena and pre-suit investigative powers in executing his duty to enforce State Law, including when "act[ing] as the civil prosecutor."[45]

139.   The suit against InComm was a creation of the SFCAO's Affirmative Litigation unit, whose function is to "pursue public interest cases under California's Unfair Competition Law."   What constitutes a "public interest case[]" is largely at the discretion of the SFCAO's attorneys and their inner circles.   The office's "Guide

---

[45] San Francisco Mun. Code § 2A.231 (2000).

to Affirmative Litigation" invites attorneys to be "entrepreneurial" about "seek[ing] out problems" for the SFCAO to solve through affirmative litigation.[46]

140.   The SFCAO's attorneys are also "encouraged" to develop case ideas through all possible sources, including but not limited to "conversations [SFCAO] employees have in their communities."[47]   The office also draws support from students at Yale Law School, who support its work by participating in a clinic, the San Francisco Affirmative Litigation Clinic, and assist the SFCAO in conceiving and developing cases.

141.   As these descriptions reflect, the SFCAO's process for choosing its cases is a freewheeling one, drawing from such varied and idiosyncratic sources as lawyers' "conversations in their communities" and the "brainstorm[ing]" of law students.[48]

142.   The SFCAO has limitless discretion to bring so-called "consumer protection" suits, and to do so with the imprimatur of the State of California.  Under California's UCL, City Attorneys' offices such as the SFCAO are empowered to

---

[46] San Francisco City Attorney's Office, *Local Action, National Impact: A Practical Guide to Affirmative Litigation for Local Governments* (Apr. 2019) at 21, https://www.sfcityattorney.org/wp-content/uploads/2019/04/A-Practical-Guide-to-Affirmative-Litigation-FINAL-4.13.19-1.pdf.

[47] *Id.*

[48] *Id.*

pursue consumer protection suits "in the name of the people of the State of California." Cal. Bus. & Prof. Code § 17204.

143.    Thus the SFCAO claims the authority to bring claims on behalf of the People of the State of California, with a population of 39 million people. Yet the City Attorney is electorally accountable only to the people of San Francisco, a city of just 800,000—approximately 2% of the population of California.

144.    Though the discretion enjoyed by the SFCAO's Affirmative Litigation may be beneficial in some instances, it is problematic in the context of this limited electoral accountability. Once those few San Franciscans have chosen their City Attorney, the entire State of California—and indeed the entire nation, as InComm's experience reflects—becomes subject to his whims, and to his determinations as to what constitutes a suitable "public interest case" for the SFCAO to undertake.

## B.    The SFCAO's Motive and Opportunity to Use UCL Litigation for Revenue Generation

145.    The structure of the UCL also sets up a conflict of interest between the voters of San Francisco and the interests of those who, like InComm, must face the SFCAO's arbitrarily-chosen lawsuits. In its effect, if not by its terms, the statute enables the SFCAO to operate like any private plaintiffs' firm, using the proceeds from its prosecution of UCL suits to fund its office's operations. Although the statute nominally averts this dynamic by limiting the purpose for which such funds

may be used, the City Attorney has both the discretion and the incentive to disregard those limitations, and to treat UCL recoveries as a general-purpose local slush fund.

***The UCL Structure***

146.    As noted above, the UCL empowers the SFCAO to bring consumer-protection suits in the name of the People of the State of California, while remaining accountable only to San Francisco voters.  What is more, the UCL provides that all monetary proceeds from any such suit "shall be paid to the ***treasurer of the city and county in which the judgment was entered for the exclusive use by the city attorney*** for the enforcement of consumer protection laws."   Cal. Bus. & Prof. Code § 17206(f) (emphasis added).

147.    In other words, the SFCAO may bring a UCL suit in the name of the State of California, but the full monetary rewards of that suit will flow entirely to the City and County of San Francisco—and specifically to the SFCAO's own coffers.

148.    The one condition is that, per the UCL, the SFCAO must use such funds "exclusive[ly] . . . for the enforcement of consumer protection laws."  Cal. Bus. & Prof. Code § 17206(f).  As the California Supreme Court has held, this "mandate" is critical to ensuring that local law enforcement agencies do not abuse their UCL enforcement power to generate local windfalls.  *See Abbott Labs. v. Super. Ct.*, 9 Cal. 5th 642, 662 (Cal. 2020) ("[C]oncerns about local 'windfalls' [expressed by the California Attorney General] are tempered by the UCL's mandate that all penalties

recovered by local prosecutors be used exclusively for the enforcement of consumer protection laws." (citation and internal quotation marks omitted)).

149.  The UCL provides a mechanism to ensure that when the California Attorney General recovers penalties through UCL litigation, those funds are reserved for the "exclusive use . . . [of] enforcement of consumer protection laws" by creating a restricted "Unfair Competition Law Fund" within the state treasury. Cal. Bus. & Prof. Code § 17206(c)(4), (d).  The statute provides that these funds can be used for consumer protection enforcement only upon "***upon appropriation by the Legislature***" for that purpose.  *Id.* (emphasis added).

***The UCL's Lack of Oversight***

150.  By contrast, the statute provides no mechanism for enforcing the parallel spending restriction on local city or county attorneys' offices that recover penalties under the UCL, and are nominally limited to using those penalties for further consumer-protection enforcement.  UCL penalties obtained by local public attorneys are to be paid directly "to the treasurer of the city and county in which the judgment was entered."  Cal. Bus. & Prof. Code § 17206(f).

151.  The legislature thus relies on municipalities like San Francisco to establish their own mechanisms to ensure that penalties recovered in UCL litigation are used only for consumer protection enforcement.

152.   To address this, many municipalities in California have instituted rigorous policies and accounting guidelines to ensure that UCL penalties are used only for their statutorily-approved purpose of enforcing consumer protection laws. *See, e.g.*, Los Angeles Charter § 5.430 (establishing trust fund for special revenue from consumer-protection enforcement by the City Attorney).   By contrast, San Francisco has no published procedures to ensure it complies with the UCL's restrictions on the use of penalties.

153.   In all events, the ability of municipalities to pursue UCL claims across the state creates the incentive and opportunity to use the recoveries to pad local coffers.   An office like the SFCAO, which must support both affirmative and defensive litigation, as well as non-litigation work on behalf of the City, is particularly motivated to use UCL cases as a supplementary budget source.   As the SFCAO has observed, it "must handle all legal work for the City as it comes [in]to our Office.   We don't have control over the number of lawsuits filed, for example, but must nonetheless defend them."[49]

---

[49] City Attorney's Office Department Budget Submission Checklist FY25 and FY26, https://www.sf.gov/sites/default/files/2024-02/City%20Attorney%20Budget%20Submission%20FY25%20and%20FY26..pdf ("San Francisco City Attorney's Office Budget Submission FY25 and FY26") at 5.

154.    The SFCAO does, however, control the volume of affirmative litigation it brings, and by obtaining UCL recoveries it can shift budget dollars that otherwise would support affirmative claims to pay for its ever-growing defensive obligations. The incentive is clear: as costs rise, the SFCAO is under pressure to bring more affirmative claims to generate revenue to prop up its defensive work.

### C.    San Francisco is Facing Dire Challenges and Revenue Shortages

155.    That incentive is stronger than ever for San Francisco, which has found itself desperately cash-strapped in recent years.  City businesses, retailers, and individual families have all fled the city in significant numbers since the pandemic, reducing the city's tax base and hollowing out its commercial districts.[50]  In 2023,

---

[50] *See, e.g.*, Hanna Zakhaenko & Christian Leonard, *The Bay Area's Population Has Changed Dramatically Since the Pandemic*, S.F. Chron. (Oct. 6, 2024), https://www.sfchronicle.com/projects/2024/bay-area-migration-trends-map/; Yuri Avila & John Blanchard, *S.F. Downtown Exodus: Map shows every major retail closure since 2023*, S.F. Chron. (May 16, 2024), https://www.sfchronicle.com/projects/2023/san-francisco-downtown-closing/; Aldin Vaziri, *Another Major Retailer to Close Store at San Francisco Mall, Citing Neglect*, S.F. Chron., (May 14, 2024), https://www.sfchronicle.com/sf/article/american-eagle-closing-sf-mall-19457486.php; Roland Li, *S.F.'s Biggest Mall Lost Nearly $1 Billion in Property Value After Retail Exodus*, S.F. Chron. (Jan. 12, 2024), https://www.sfchronicle.com/bayarea/article/san-francisco-centre-valuation-18605584.php ("*S.F.'s Biggest Mall*"); Roland Li, *S.F.'s Union Square Loses Another Clothing Retailer*, S.F. Chron. (Oct. 11, 2023), https://www.sfchronicle.com/sf/article/s-f-union-square-loses-clothing-retailer-express-18417918.php.

home sales declined by 25% from the prior year and the median home sales price dropped 13%, reaching its lowest level since 2017.[51]

156.    These issues are compounded by the circumstances facing the City's most vulnerable residents, including the many San Franciscans who do not have stable housing.  As of the City's most recent official survey in January 2024, there were more than 8,000 individuals experiencing homelessness in a city of fewer than 800,000 people.  More than half of these homeless individuals were "unsheltered," i.e., living on streets or in tents rather than in homeless shelters.  Between 2022 and 2024, the City's homeless population increased by 7% even as its overall population declined.[52]

157.    A related, and equally devastating, issue facing the City is its high proportion of opioid use and opioid-related fatalities.  In 2023, the City recorded 88 fatal drug overdoses for every 100,000 residents—a 15% increase from the prior

---

[51] Kevin V. Nguyen, *San Francisco home prices have fallen to pre-pandemic levels.  Will they drop further in 2024?*, S.F. Standard (Jan. 6, 2024), https://sfstandard.com/2024/01/06/2023-san-francisco-bay-area-home-prices-recap/.

[52] San Francisco 2024 Point-in-Time Report, Applied Survey Research (ASR) at 17 (Aug. 13, 2024), https://hsh.sfgov.org/wp-content/uploads/2024/08/2024-San-Francisco-Point-in-Time-Count-Report-8_13_24-1.pdf.

year's rate, and more than ***two and a half times*** the U.S. national average of 30 overdose deaths per 100,000 residents.[53]

158.   These crises generate untold human suffering.   They have also exacerbated the City's systemic challenges and stymied its fiscal recovery. Homelessness and opioid use absorb considerable City resources, while also driving away the residents and retailers that the City depends on for tax revenue.  One local independent grocer, announcing the 2023 closure of his store after 35 years in business, voiced frustration that "the homeless and the fentanyl crisis" had absorbed the City's resources, and that "having to deal with shoplifters every day and multiple break[-]ins has just become unendurable."[54]   Similar concerns have driven other retailers to depart, in what the Chronicle has described as a "retail exodus" from the City.[55]

---

[53] Christian Leonard, *S.F.'s overdose deaths spiked in 2023, but it's not the highest in the U.S.*, S.F. Chron. (Aug. 16, 2024), https://www.sfchronicle.com/bayarea/article/drug-overdose-death-us-19654356.php.

[54] Maliya Ellis, '*You can only take so much': South Beach market to close after 35 years, citing crime, costs*, S.F. Chron. (Sept. 7, 2024), https://www.sfchronicle.com/bayarea/article/sf-market-closing-19749807.php.

[55] *See, e.g.*, Li, *S.F.'s Biggest Mall*, *supra* note 50.

159.    All the while, the City has done little to control the rampant retail crime within its borders.  Shoplifting increased following the pandemic,[56] and although the State has implemented measures to curb the problem, San Francisco business owners are continuing to feel the impacts.[57]

160.    Indeed, stores that sell InComm products have been targets of such crime.  Shoplifters target these stores in broad daylight, fully aware that the City will not stop them, and that they will not be prosecuted.[58]

161.    These overlapping issues have precipitated a fiscal crisis for the City. As of May 2024, the City was facing an $800 million two-year budget deficit, due to the loss of revenues associated with retail and tourism.  As the San Francisco *Examiner* put it, "the City's revenues have sagged in its post-pandemic economic

---

[56] Tran Nguyen, *New California laws target smash-and-grab robberies, car thefts and shoplifting*, PBS.org (Aug. 16, 2024), https://www.pbs.org/newshour/politics/new-california-laws-target-smash-and-grab-robberies-car-thefts-and-shoplifting.

[57] Lena Howland, *CA's new retail theft laws come at a time when SF small business owners say they need more support*, ABC News (Aug. 16, 2024), https://abc7news.com/post/ca-retail-theft-laws-gavin-newsom-sf-crime-smash-grab-robbery/15194634/.

[58] Carlos Castaneda & Jose Martinez, *Watch: Thieves ransack Walgreens store near San Francisco's City Center*, CBS News (Apr. 1, 2024), https://www.cbsnews.com/sanfrancisco/news/walgreens-retail-theft-shoplifting-san-francisco-civic-center-caught-on-camera/.

malaise and failed to keep up with its spending."[59]    The City is bracing itself for "painful" budget cuts as a result.[60]

162.    In short, the City has fallen on difficult times, and its leadership is under immense pressure to address the fiscal crisis, revive its anemic housing market and commercial districts, and address the suffering and lawlessness brought on by the homelessness and opioid crises.  These are, to be sure, difficult and complex issues. It is no wonder that the City has gone looking for easy fixes—such as blaming the victims of retail crime, at the expense of prosecuting its perpetrators.

### D.    The SFCAO's Express Reliance on UCL Cases for Revenue Generation

163.    These budgetary pressures affect all instrumentalities of City government, including the SFCAO, whose workload has grown even as a budget deficit looms.  So the SFCAO is dialing up its dependence on an easy cash source: recoveries from consumer protection suits brought "on behalf of the State" under the UCL.

---

[59] Adam Shanks, *How Mayor Breed wants to close $800 million deficit*, S.F. Examiner (May 31, 2024), https://www.sfexaminer.com/news/politics/how-london-breed-budget-proposal-would-close-sf-deficit/article_73dfe296-1edd-11ef-b5f2-235ea8a2fdb8.html.

[60] *Id.*

164.   The SFCAO has openly trumpeted UCL consumer-protection revenues as a solution to its budget woes.   According to the office's public budgeting documents, UCL suits "generate revenue" for the City, so they net profit rather than cost.   They are also quick and easy.   As set forth in Section IV, *supra*, the SFCAO has tremendous discretion to select and pursue UCL claims, so the office can initiate these "revenue-generating" suits with minimal oversight or investments.

165.   Even better, the SFCAO can pursue UCL claims against—and wrangle settlements from—U.S. businesses that are far from San Francisco and even from California.   Such extraterritorial UCL recoveries bring cash to the City and its residents, which is to say the SFCAO's constituency, without burdening the City's troubled economy.   They also carry no risk of political repercussions for the SFCAO or City leadership.

166.   These advantages have led the SFCAO and the City's leadership to embrace UCL suits as a bonus source of "revenue" during bleak times.   Public budgeting documents suggest that the SFCAO has flouted, or at least been lax about enforcing, the UCL's mandate that such funds be earmarked "exclusive[ly] . . . for the enforcement of consumer protection laws."   Cal. Bus. & Prof. Code § 17206(f). But regardless of how the City directs UCL funds, it has made clear that it views UCL suits as a source of "revenue" for local use.   Protecting California consumers is, at best, an afterthought.

*The SFCAO's Budget Plans:  Affirmative Litigation as a Bailout Fund*

167.   The SFCAO's budget-related publications make clear that the office, like other City offices, has faced severe budgeting shortfalls.  In the office's February 2024 initial proposal for its own fiscal year 2025 budget (a component of the City's overall fiscal year 2025 budget), the SFCAO explained that it is bracing for a "10% reduction" in allocations from the City's General Fund.[61]  This reduction is linked to the "significant projected budget deficits" looming on the horizon for San Francisco.

168.   To make matters worse, just as the SFCAO's funding has dwindled, its workload has multiplied as a result of the housing shortage and other local crises. According to the same February 2024 budget proposal, the SFCAO has contended with "complex and substantial . . . litigation demands related to the City's homelessness and mental health policies" in the past year.  The office is also dealing with "substantial increases in homeless encampment"-related claims, as well as a "three-fold increase" in home assessment appeals, all of which it is responsible for defending.[62]  These descriptions make clear that San Francisco's housing shortage

---

[61] Public Budget Hearing, San Francisco City Attorney's Office, at 5, https://www.sfcityattorney.org/wp-content/uploads/2024/02/Budget-Presentation-BY2025.pdf ("Feb. 2024 Budget Presentation").

[62] *Id.* at 4.

and economic struggles have generated additional demands for the SFCAO while placing a strain on its funding.

169.   In the February 2024 proposal, the SFCAO offered just one concrete solution to resolve this issue:  "***Propose two attorney positions fully funded by the restricted Consumer Protection Fund***"—i.e., the pool of funds the SFCAO has amassed from previous UCL enforcement suits—in order "***to expand revenue-generating affirmative [litigation] work***."[63]  That is, the SFCAO plans to draw from its consumer-protection funds to hire two new attorneys, who in turn can pursue affirmative litigation cases, which the SFCAO considers "revenue-generating."

170.   To that end, the office proposed rapidly increasing its annual allocations from the Consumer Protection fund, from $4.7 million in fiscal year '23-'24 to $5.7 million in fiscal year '25-'26.[64]  Otherwise the SFCAO proposal identified no new sources of funding to address the budget crisis, nor any reductions in staffing or expenses.[65]  Past and future windfalls from affirmative litigation, such as the hastily-generated suit against InComm, constitute the SFCAO's ***entire plan*** for navigating the San Francisco budget crisis.

---

[63] *Id.* at 6 (emphasis added).

[64] *Id.* at 8.

[65] *Id.* at 6–8.

171.    Several months later, in a more detailed budget submission to the Mayor's Office, the SFCAO elaborated on this plan.  The SFCAO referenced its "growing caseload of defensive litigation," and lamented that because of this increased workload, "deputies on our Complex & Affirmative Litigation Team have needed to take on more defensive work than usual, so that only 38% of [their] hours have been spent on affirmative work."[66]  To account for this increased workload and the anticipated reduction in General Fund availability, the SFCAO reiterated its proposal to increase its annual draw from the designated Consumer Protection fund by roughly $1 million.[67]

172.    The SFCAO also expanded on its plan to hire two new attorneys with that money.  First, the SFCAO plans to hire a "new attorney to investigate and work on affirmative litigation cases," now that the current affirmative team has been sidelined by defensive work.[68]  The key selling point is that the position will be "fully funded by the restricted Consumer Protection Fund" and "will not require funding from the General Fund."[69]

---

[66] San Francisco City Attorney's Office Budget Submission FY25 and FY26, *supra* n. 49 at 2, 4.

[67] *Id.* at 10 (Form 2A:  Revenue Report).

[68] *Id.* at 4.

[69] *Id.*

173.   Notably, though the new attorney will be "fully" bankrolled by the consumer-protection **fund**, there is no indication that the attorney's hours will be "fully" (or even primarily) devoted to consumer-protection **work**.

174.   The SFCAO also plans to draw on these consumer-protection funds to establish its second new attorney position, which will have nothing at all to do with consumer protection work, but will instead be focused on "worker protection" on behalf of "San Francisco's residents and workers."  Nevertheless, this position will also "be fully funded by our restricted Consumer Protection Fund" and "will not require funding from the General Fund."[70]  Thus, the SFCAO's budget submission endorses heavy and indiscriminate reliance on the Consumer Protection Fund, which is comprised of past UCL recoveries, to cover its budget shortfalls and fund its operations.

175.   The SFCAO also highlights the potential for future affirmative litigation to "assist in **recovering revenue for the City and County of San Francisco**."[71]  That is why a new affirmative litigation position is "needed to expand our revenue-generating affirmative work" and "bring cases that could result in monetary recovery for the City."[72]  It touts its track record in this area, pointing out

---

[70] *Id.* at 4-5 (emphasis added).

[71] *Id.* at 2.

[72] *Id.* at 4.

that its recent settlement of opioid-related affirmative cases "will bring in more than $37 million for the City this upcoming fiscal year alone."[73]

176.    The SFCAO predicts that affirmative litigation will continue to be a lucrative revenue source for San Francisco.  It even calls out a promising example: "This past year, our Office sued the maker of Vanilla gift cards for [consumer protection violations]."[74] Then it reiterates the need to continue pursuing this sort type of "revenue-generating" litigation for the City.

***The Impropriety of the SFCAO's Approach***

177.    The SFCAO's unabashed use of UCL enforcement to pad local coffers is problematic in several respects.  *First*, although the SFCAO uses an ever-increasing proportion of Consumer Protection funding to cover personnel costs, it is not clear that the office has any process for ensuring that its consumer-protection expenditures are commensurate with its consumer-protection activities.

178.    Indeed, in its current budget submission, the office proposes adding two attorney positions that are "fully" bankrolled by the Consumer Protection Fund, but do not appear to be limited to consumer protection work.  On the contrary, one of

---

[73] *Id.*

[74] *Id*.

the positions appears to be geared toward *worker* protection, not consumer protection.

179.   *Second*, even if the City nominally earmarks consumer-protection funds as required by the statute, its reliance on UCL enforcement to replenish revenue creates perverse incentives to bring claims against out-of-state defendants without conducting reasonable diligence, all in the hope of generating a quick profit. As the California Supreme Court has held, such parochial and opportunistic motives are contrary to the goals of the UCL.  The restriction on recovery fund use is meant to discourage them.

180.   The real challenges that have driven the City to seek these "windfalls" do not mitigate the impropriety of using the UCL as a revenue-generator rather than a tool for consumer protection.  By the statute's terms, UCL recoveries are not intended to bail cities out of fiscal crises precipitated by housing shortages, drug-use epidemics, or falling home prices.  They are intended only to pay for ongoing consumer protection enforcement.  Because the costs of UCL enforcement did not create the City's budget problems, the rewards of UCL enforcement cannot solve them.

181.   *Third*, even when discussing benefits of affirmative litigation beyond revenue generation, the SFCAO's deeply parochial focus is inconsistent with its claim to maintain UCL suits on behalf of the "the People of the State of California."

Alongside its discussion of revenue generation "for the City," the SFCAO touts the power of affirmative litigation to "protect[] consumers and residents *in San Francisco*," and to "protect[] *San Francisco* against . . . public nuisances."  And the SFCAO's pitch for a new Consumer-Protection-funded employment attorney is similarly hyper-local, noting that the position is necessary to "*protect San Francisco's residents and workers*," not least so that those workers "*have money . . . to spend here in San Francisco*."[75]

182.   Yet when prosecuting suits under the UCL, the SFCAO purports to act on behalf of the 39 million "People of the State of California."  In reality, as these comments show, the SFCAO is looking out only for the 800,000 who live in San Francisco.  And even then, it is at least as concerned with drumming up "revenue" for San Francisco denizens as with protecting them from deception.

183.   InComm invited the SFCAO to explain its use of the restricted Consumer Protection Fund and allocation of resources but has yet to receive a meaningful response.  On October 21, 2024, InComm submitted a request to the SFCAO for public records regarding the SFCAO's budget and segregation of Consumer Protection Funds, pursuant to the California Public Records Act, Cal. Gov. Code § 792.000, *et seq*.

---

[75] *Id.* at 4 (emphasis added).

184.  Individuals at the SFCAO, all the way up to Chiu himself, made clear to InComm's counsel that the SFCAO was upset and affronted at receiving a public records request directed at its compliance with UCL provisions on restricted funds. After voicing this dismay and invoking a two-week extension of its time to respond, on November 14, 2024, the SFCAO produced the February 2024 Budget Presentation discussed above, along with the job descriptions for the two attorney positions to be funded by the Consumer Protection Fund, documents which are already available online and referenced in InComm's requests.

185.  In other words, the SFCAO provided no records whatsoever demonstrating its compliance with the UCL-mandated limitation on the use of consumer protection funds.  The SFCAO contends that this was the start of a "rolling" production, but has not provided details on what further documents it will supply or when it will do so.

186.  All of these circumstances suggest that Defendants' case against InComm is motivated by parochial opportunism rather than by any legitimate State interest.  Defendants have instead targeted InComm as an out-of-state company that they hope to shake down for a much-needed infusion of cash.  In so doing, they have improperly discriminated against out-of-state businesses and burdened interstate commerce, have targeted InComm with improper animus, and may have flouted their obligations under the UCL.

### E.    Defendants' Apparent Favoritism Toward Blackhawk

187.    The above facts suggest that Defendants' local financial interests impelled them to drum up UCL cases against out-of-state defendants in general. They may have zeroed in on gift card fraud because the Chinese money laundering syndicate has placed that subject in the news.  But their decision to sue InComm, in particular, appears driven by another improper motive: competitive favoritism toward Blackhawk.

188.    Blackhawk has deep Bay Area roots.  The company formed as a division of Safeway, a Bay Area retail chain; spun off as an independent company; and is now owned by a Bay Area private equity company.  While many tech companies have fled the area in recent years, Blackhawk has remained at its headquarters in Pleasanton, California.

189.    Blackhawk competes vigorously with InComm, its out-of-state rival, for retailer contracts for card distribution.  Several years ago, in a particularly notable competitive coup, InComm won the contract to distribute prepaid open-loop cards for Safeway, the grocery chain that had given Blackhawk its start.

190.    As noted above, Blackhawk, like InComm, distributes and services open-loop, non-reloadable, anonymous prepaid gift cards.  These products, like InComm's analogous products, have been targeted by fraud over the years—including, most recently, by Chinese money-laundering syndicates.  To deter

package tampering fraud, Blackhawk, like InComm, has packaged its products between sealed, opaque cardboard panels, with additional exterior features that make it difficult to tamper with the packages without leaving visible signs.

191.  Blackhawk and the SFCAO also have a mutual friend in the law firm Cooley LLP.  Cooley is presently representing the City in its contentious trademark suit against the City of Oakland, challenging the recent renaming of Oakland's airport.[76]  Meanwhile, Cooley had represented Blackhawk in a patent dispute ***with InComm*** that concluded in mid-2023.[77]

192.  Cooley's departing associates join the SFCAO with some regularity. Indeed, one of the principal attorneys involved in the case against InComm had recently arrived at the SFCAO from Cooley.  Public filings show that, while at Cooley, he worked on matters with the lead partner who represented Blackhawk in its patent dispute with InComm.  Then, within months of joining the SFCAO, he signed on to a lawsuit that would benefit Blackhawk at InComm's expense.

193.  To be clear, InComm is not accusing this (or any other lawyer) of ethical breaches.  But the SFCAO-Cooley-Blackhawk connection strongly suggests

---

[76] *See City and County of San Francisco v. City of Oakland*, No. 3:24-cv-02311 (N.D. Cal.).

[77] *See, e.g.*, *Blackhawk Network, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 2022-1650, 2023 WL 3861082 (Fed. Cir. June 7, 2023).

that the SFCAO knew, when filing suit against InComm, of the competitive advantages that the suit could yield for Blackhawk. This, in turn, suggests that these circumstances, together with the pressure to drum up "revenue-generating" affirmative cases, guided the SFCAO's decision to target Georgia-based InComm while sparing its Bay Area-based competitor.

194.   Defendants' subsequent conduct of the litigation has reinforced the appearance of an alliance with Blackhawk. As noted above, the complaint drew an unflattering (and spurious) comparison between InComm and Blackhawk. The SFCAO has claimed in court filings that one of the objectives of the lawsuit is to secure an "honest marketplace," so that other "prepaid card companies . . . are not at a disadvantage,"[78] though it has not said which "prepaid card companies" it has in mind.

195.   Finally, the SFCAO has shown an odd preoccupation in discovery with the competitive dynamic between InComm and Blackhawk. In May 2024, the SFCAO served a subpoena on Safeway's Pleasanton headquarters, seeking documents relating to—among other things—Safeway's "change from the Blackhawk Network to INCOMM as [Safeway's] provider of prepaid gift cards in

---

[78] *California v. InComm Fin. Servs., Inc.*, No. 3:23-cv-06456-WHO, Pl. Reply in Support of Mot. to Remand, ECF 33 (N.D. Cal. Feb. 23, 2024), at 8.

or around 2021." Shortly thereafter, the SFCAO lawyers pressed InComm for discovery regarding any travel to California by InComm's representatives in the course of InComm's successful bid for the Safeway contract in or around 2021. While discussing this request on a meet-and-confer, the SFCAO's lawyers described Blackhawk as having been "Safeway's baby" before Safeway switched to InComm.

196.    This focus on the Safeway contract switch is, to say the least, peculiar. The subject has no apparent connection to the SFCAO's claims, such as they are. It is also highly obscure and insignificant—to everyone but Blackhawk. The SFCAO's preoccupation with this subject adds to the appearance that, through some mechanism or another, its actions are driven by allegiance to Blackhawk, and a desire to boost Blackhawk's competitive interests.

### F.    Defendants' Defeat of Federal Jurisdiction

197.    Having filed suit against InComm for these improper purposes, the SFCAO then defeated removal to federal court by claiming to act on behalf of the People of the State of California rather than San Francisco. The SFCAO successfully persuaded the federal court that it could not exercise diversity jurisdiction because the SFCAO was acting on behalf of the state of California, and as such was not considered a citizen of any state for diversity purposes.

198.    In urging the federal court in San Francisco to remand in the InComm suit, the SFCAO claimed that "San Francisco is not pursuing any claims on its own

behalf or seeking any relief that inures to the benefit of the City," and that the only plaintiff is "the People of the State of California."[79]  The SFCAO asserted that, "[i]n exercising [UCL enforcement] authority, city attorneys act on behalf of the People – *not* on behalf of their individual municipalities."[80]  Yet just weeks later, the office gave its budget presentation proclaiming UCL suits an excellent means of "***recovering revenue for the City and County of San Francisco***."[81]

199.    The SFCAO also dismissed as a "canard" InComm's argument that San Francisco would reap the monetary awards from the suit.[82]  It argued that, "[o]n the contrary, the penalties may only be used 'by the city attorney for the enforcement of consumer protection laws,' Cal. Bus. & Prof. Code § 17206(f), and therefore advance the State's—not only San Francisco's—interest."[83]    In fact, as its contemporaneous budgeting documents demonstrate, the SFCAO uses the Consumer Protection fund as a general source of relief from municipal budget

---

[79] *California v. InComm Fin. Servs., Inc.*, No. 3:23-cv-06456-WHO, Pl. Mot. to Remand, ECF 28 (N.D. Cal. Jan. 30, 2024), at 10–11.

[80] *Id.* at 10 (emphasis in original).

[81] San Francisco City Attorney's Office Budget Submission FY25 and FY26, *supra* n.49 at 1 (emphasis added).

[82] Pl. Mot. to Remand, *supra* note 79 at 17.

[83] *Id.*

shortfalls during difficult times, without any reference to the State's interests whatsoever.

200.   In other words, the SFCAO is ready to portray its interests as coterminous with the state of California when it seeks to defeat diversity jurisdiction. But in budget documents submitted to the City, it tells a different story, highlighting how its affirmative litigation provides a benefit to the City alone.  It is unfair to InComm, and inimical to the principles behind diversity jurisdiction, for the SFCAO to have it both ways.

### G.    Harm to InComm

201.   As a result of Defendants' improperly-motivated persecution, InComm has been forced to incur the significant costs and burdens of litigation for more than a year.  The pendency of the suit has hampered InComm's ability to plan and pursue future business operations, including in California.

202.   This is particularly so given that a prevailing defendant in California generally cannot recover its attorneys' fees.  Thus, even if InComm is able to defeat the SFCAO's lawsuit in California, it will not be able to recoup the significant fees it has been forced to incur in defending the out of state action.

203.   The suit has also had serious reputational impact.  Since November 2023, InComm has received at least 15 inquiries from the media that reference Chiu's suit and seek a response to his allegations.  InComm has also faced inquiries

from retailers and other business partners about its security practices. And it has suffered an erosion of the consumer trust that is central to its business. In this way, Defendants' lawsuit against InComm and defamatory insinuations have irreparably harmed InComm's protected business interests without due process of law, resulting in a "stigma plus" associated with their unlawfully motivated actions.

204.   InComm has felt this harm at home: in Georgia. As Defendants knew that InComm was a Georgia-based company—a fact they highlighted in their own communications concerning the San Francisco Action—they knew or reasonably should have foreseen that suing InComm and defaming it would cause injury to InComm in Georgia.

## V.     David Chiu Makes False and Defamatory Statements About InComm

205.   After filing its meritless complaint on November 9, 2023, the SFCAO decided to double down on the complaint's baseless and unsupported accusations by going on a defamatory media blitz against InComm. On November 20, 2023, the SFCAO posted a press release about the lawsuit to its website that went far beyond the allegations in the complaint. It announced: "[a]head of the holiday shopping season, City Attorney is taking action to protect and seek restitution for consumers

who have been victims of 'card draining.'"[84]  In the statement, Chiu falsely accused InComm of negligently "open[ing] the door for scammers to defraud thousands of consumers" and of "add[ing] insult to injury" by "regularly refus[ing] . . to refund consumers who are scammed out of their money as a result of Vanilla gift card draining."

206.    Chiu then implored consumers to refrain from purchasing InComm's products: "As we kick off the holiday season, we are filing this lawsuit to sound the alarm [about InComm]."[85]  This statement, which was and remains viewable online in Georgia, including in this District, was not focused on alleged harm to consumers in San Francisco.  Rather, it pointedly described InComm as the "***Georgia-based*** maker of Vanilla gift cards . . . that are widely available . . . throughout the country."[86]

---

[84] Press Release, *City Attorney of San Francisco, City Attorney sues maker of Vanilla gift cards over consumer scams* (Nov. 20, 2023), https://www.sfcityattorney.org/2023/11/20/city-attorney-sues-maker-of-vanilla-gift-cards-over-consumer-scams/.

[85] David Chiu, Facebook (Nov. 20, 2023), https://www.facebook.com/story.php/?story_fbid=853364239574570&id=100047030050834 ("Chiu Facebook Post") and David Chiu (@DavidChiu), X (formerly Twitter) (Nov. 20, 2023), https://x.com/DavidChiu/status/1726702092965101590 ("Chiu X Post").

[86] Press Release, *supra* note 84 (emphasis added).

207.   Chiu then amplified the SFCAO's statements on social media.   The same day his office released its press statement, Chiu posted on his Facebook and X accounts: "As we kick off the holiday season, we are filing [the complaint] against the maker of Vanilla gift cards to sound the alarm, compel In[C]omm to adopt industry-standard security features to stop card draining, and obtain restitution for consumers who have been harmed."[87]   These statements were and remain viewable online in Georgia, including in this District.

208.   As set forth above, Chiu knew perfectly well that these statements were false.   He had no basis for claiming that InComm's security features were below "industry standard."   No one from his office had tested out these claims, or even engaged with the packaging of any other product available in the industry.

209.   Chiu's litigation-through-social-media posts also linked to a televised interview he gave on November 20, 2023 with San Francisco's ABC7 News.[88] During the segment, a reporter praised Chiu for his "bold pre-holiday move" of suing InComm, noting (presciently) "this is going to be a wild case."   Chiu went on to falsely state that InComm's customers are injured by "a relatively unsophisticated

---

[87] Chiu Facebook Post and Chiu X Post, *supra* note 85.

[88] 7 On Your Side, *SF city attorney files lawsuit against gift card company over inadequate security, scams*, ABC News (Nov. 20, 2023), https://abc7news.com/gift-card-scams-empty-vanilla-san-francisco-city-attorney-david-chiu/14078762/.

crime"—a "scam known as card draining" that he asserted is "made possible by InComm's inadequate security."  He also told ABC7 that "In[C]omm has been regularly refusing to provide refunds to consumers who've lost money, which is in violation of state and federal law," a contention which lacks any basis in fact.  This video was and remains viewable in Georgia, including in this District, both on ABC7's website and on Chiu's social media accounts.

210.  Chiu's media offensive resumed two days later when he blogged on his personal campaign website (votedavidchiu.com): "As we enter the holiday season, I wanted to let you know about a consumer protection lawsuit my office just filed against the makers of Vanilla gift cards."[89]  He then linked to the same ABC 7 interview he gave on November 20.  This blog post was and remains viewable online in Georgia, including in this District.

211.  This campaign post was followed a week later by another television appearance.  On November 29, 2023, Chiu sat for interview with San Francisco's KRON4.[90]  During this interview, Chiu accused InComm of "ma[king] gift cards

---

[89] David Chiu, *This holiday season, don't get scammed*, David Chiu for City Attorney 2024 (Nov. 22, 2023), https://votedavidchiu.com/this-holiday-season-dont-get-scammed/.

[90] Aaron Tolentino, *SF Residents warned about Vanilla gift card scam amid holiday shopping season*, KRON4 (Nov. 29, 2023), https://www.kron4.com/news/bay-area/sf-residents-warned-about-vanilla-gift-card-scam-amid-holiday-shopping-season/.

that are vulnerable to rampant theft with inadequate packaging and security," stating that InComm "has not designed their cards or secured their cards in a way to protect these thefts from occurring." Then, when asked "how do the scammers know when to siphon off the money and how do they do it?" he answered: "So, it's a pretty unsophisticated crime known as card-draining." He continued:

> So, what happens is someone will walk into a retail environment. They will take a card off the shelf. They'll quietly open up the envelope, take a photograph or otherwise track the number, put it back on the shelf and then an unsuspecting consumer will then purchase the product, it'll get loaded with money and the scammer, all they have to do is just track when the card has been activated and the second it's activated, they'll use the card number themselves.

Chiu then claimed that InComm was "the most egregious" maker of gift cards and explicitly "recommend[ed] that people not purchase Vanilla gift cards"—a baseless claim that appears nowhere in the complaint. Chiu's statements to KRON4 were and are viewable online in Georgia, including in this District.

212. Although Chiu was describing package tampering in broad terms, his comments made clear he had no idea how package tampering is executed or the level of "sophistication" it requires. Contrary to Chiu's assertions, the individuals who attempt package tampering do not and cannot do so while "quietly" standing in a

store, but instead must take the cards to designated locations with specialized equipment.  They also do not generally operate alone but rather cooperate via sophisticated criminal syndicates.

213.   Chiu's account of package tampering during his television appearance underscored once again that his office had conducted no meaningful investigation prior to filing a complaint against InComm relating to that topic.

214.   Chiu wrapped up the initial phase of his press blitz a few weeks later when he sat for a third televised news interview, this time in InComm's hometown of Atlanta.  Chiu told Atlanta's local news channel WSB-TV Channel 2: "We know that InComm . . . has been aware for years that their inadequate packaging and their lack of security has allowed criminals to steal money from unsuspecting consumers."[91]  He further claimed, for the first time: "What we understand is it's a mere penny on the dollar for them to provide a little additional security."[92]  This interview, which was and remains viewable in Georgia, was directed squarely at Georgians, including those residing in this District.

---

[91] Justin Gray, *Atlanta-based company being sued following Channel 2 investigation into empty gift cards*, WSB-TV (Dec. 15, 2023), https://www.wsbtv.com/news/local/atlanta/atlanta-based-company-being-sued-following-channel-2-investigation-into-empty-gift-cards/KL2MBJWPDBA4HIY4G5UB3W6ZBM/.

[92] *Id.*

215.   Months later, on July 24, 2024, Chiu was quoted in a ProPublica article, which remains available online, including in this District, under the headline, "The Nation's First Law Protecting Against Gift Card Draining Has Passed. Will It Work?"[93]  Chiu was quoted as saying: "InComm is selling these prepaid gift cards that it knows are susceptible to rampant theft due to inadequate packaging and security."

216.   This blitz, led by Chiu, concerned alleged actions or omissions taken by InComm in Atlanta.  By attacking a Georgia company in publications available nationwide, Chiu and the SFCAO knew or reasonably should have foreseen that their statements would be published in this District and would injure InComm here. Moreover, by not tailoring his remarks to incidents occurring in San Francisco or even just in California, Chiu intended for his anti-InComm message to reach a national audience, and, consequently, to harm InComm's sales nationwide. Defendants' plan worked.  Chiu's defamatory statements were seen, heard, and read nationwide, including in this District, and have irreparably damaged InComm's reputation as a result.

---

[93] Craig Silverman, *The Nation's First Law Protecting Against Gift Card Draining Has Passed. Will It Work?*, ProPublica (Jul. 29, 2024), https://www.propublica.org/article/maryland-gift-card-scams-prevention-act-walmart-incommretail.

217.   On November 12, 2024, IFS sent a letter to Chiu demanding that he retract his false and defamatory statements and noting Chiu's "troubling pattern of making false statement about InComm."   As of the date this complaint was filed, Chiu failed to retract his statements.

218.   As alleged above, SFCAO's complaint fails to allege any facts to support its allegations about IFS or InComm's purportedly inadequate security measures on its gift cards.  *See, e.g.*, *supra* ¶¶ 106–135.  Similarly, Chiu had, and still has, no factual basis for his statements, which were made with malice, defined as reckless disregard for their truth or falsity.   This malice strips Chiu of any conditional privilege he could otherwise claim for the statements.  O.C.G.A. § 51-5-7.d.

219.   For example, as IFS explained in its retraction letter, Chiu's statement—offered without support—that gift card fraud is an "unsophisticated crime" "made possible by InComm's inadequate security" is a baseless claim belied by even cursory internet searches.  For one thing, DHS has explicitly called out how criminals have been using "***sophisticated*** methods to tamper with gift cards and exploit online vulnerabilities." *See supra* ¶ 79 n.9.  DHS has described how criminal groups "combine key characteristics of organized retail crime, victim assisted fraud, and trade based money laundering to commit gift card fraud."   Furthermore, as alleged above, InComm has worked—and continues to work—with law enforcement

in an effort to combat fraud, constantly evaluating and improving its security measures. *See supra* ¶¶ 14, 94–100.

220.   Additionally, Chiu's statement that InComm and its gift cards are the "most egregious in terms of fraud" is entirely unfounded.  Chiu purported to base this conclusion on the existence of "hundreds of consumer complaints" against InComm he saw online—ignoring the fact that InComm serves millions of consumers annually.  Chiu's statement suggests that he conducted no investigation into the actual rate of fraud occurrence (i.e., reported occurrences of fraud as a percentage of cards sold) on InComm's and its competitors' products and made no adjustment for companies' relative market share.

221.   Likewise, Chiu's statement gives no indication that he accounted for readily available evidence that InComm's competitors are the ones with systemic security issues, including numerous media reports of gift card fraud—not to mention fraud-related lawsuits—having nothing to do with InComm or its products.

222.   Chiu's reliance solely on "consumer complaints" also ignores readily accessible information from the Consumer Financial Protection Bureau ("CFPB"), which cautions against the use of these data for claims about product quality:  the CFPB has emphasized that complaint volume reflects "company size and/or market share" and the "nature of the financial product and how consumers use [it]"—not

product quality.[94]  Given these issues, the CFPB does not "adopt [complainants']

views" and cautions that that it does not "verify that their experiences are accurate

or unbiased."

223.  Lastly, Chiu's recommendation that to avoid fraud consumers should

"not purchase Vanilla cards" ignores the *many* other steps consumers can take to

protect themselves.  For example, customers can carefully inspect the packaging for

signs of tampering when they buy a gift card at a retailer; they can make sure that no

part of the card number, expiration date or security code appears missing or altered;

they can retain or take a photo of the receipt when they buy a gift card; and they can

order cards online, rather than buying them in a store.  Chiu's failure to mention *any*

of these steps suggests that he made no attempt to understand gift card fraud or

InComm's products or security measures before making his defamatory statements.

224.  Chiu's glib recommendation to avoid purchasing Vanilla Cards also

belies his claim that he made his comments in an effort to protect California

consumers.  In point of fact, consumers who wish to protect themselves against

fraud—regardless of which brand(s) they purchase—can take many steps to

accomplish that objective, such as those outlined above.  If Chiu had acted out of

---

[94] Consumer Complaint Database, CFPB, https://www.consumerfinance.gov/data-research/consumer-complaints/.

any interest in protecting consumers from gift card fraud, he could have used his platform to share these simple steps.  But because his real objective was to smear InComm and benefit its competitor, he advised them instead to avoid InComm products altogether.

225.    Through these comments, Chiu imputed fraud and dishonesty to InComm, damaging its future prospects with business partners and consumers. Since Chiu filed his ill-founded suit and made these false and defamatory comments, InComm's business has been burdened with the infamy conferred by these baseless charges.

**COUNT I**
**Violation of the United States Constitution Equal Protection Clause: Class of One Claim (42 U.S.C. § 1983)**
**Against the City of San Francisco and David Chiu in His Official Capacity**

226.    InComm realleges and incorporates by reference all preceding paragraphs.

227.    The Equal Protection Clause of the Fourteenth Amendment prohibits government officials from treating similarly-situated entities differently when there is no rational basis for the disparate treatment.  It further prohibits government actors from treating similarly-situated entities differently because officials harbor animus or ill-will toward one entity.

228.   Chiu and the SFCAO filed an action against InComm (the "San Francisco Action") captioned *People of the State of California v. InComm Financial Services, Inc.*, No. CGC-23-610333 (Cal. Super. Ct. 2023), alleging that InComm violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, by, among other things (i) failing to provide security adequate to prevent foreseeable harm to holders of Vanilla Cards from criminal and fraudulent schemes to steal cardholder balances; (ii) failing to refund cardholders whose card balances have been stolen; and (iii) misrepresenting the qualities and characteristics of Vanilla Cards.

229.   Chiu and the SFCAO have not filed any similar claims against any other provider of open-loop prepaid gift cards, including Blackhawk.  InComm is similarly situated to Blackhawk and other open-loop prepaid gift card providers in all relevant respects related to the allegations in the complaint, including that all open-loop prepaid gift cards have been targeted by criminal package tampering schemes. InComm has instituted security measures and programs that are at least as robust as—and frequently better than—those put in place by other gift card providers.

230.   Despite the fact that InComm and other open-loop prepaid gift card providers are similarly situated in all relevant respects with regard to the allegations made in the San Francisco Action, Chiu and the SFCAO brought suit against only one gift card provider:  InComm.  There is no rational basis for this stark difference

in treatment between InComm and other similarly-situated open-loop prepaid gift card providers.

231.    The decision by Chiu and the SFCAO to bring the San Francisco Action against only InComm and no other gift card providers was motivated by animus against InComm.  First, Chiu and the SFCAO instituted the suit against InComm because they seek to use affirmative litigation to plug holes in the SFCAO's budget, not for legitimate reasons of consumer protection.  Second, InComm is a Georgia-based company with no significant presence or workforce in California.  As such, a suit against InComm has no political repercussions for Chiu, who is elected by San Francisco residents.  Further, Chiu and the SFCAO have an incentive to bring a suit against an out-of-state entity like InComm because any resulting judgment or settlement, as well as the attendant negative publicity, will not affect local businesses, jobs or tax revenues.  Third, Chiu and SFCAO were motivated by a desire to help InComm's chief competitor, the Bay Area-based Blackhawk.

232.    Chiu and the SFCAO's lack of a rational basis, and animus toward InComm, are further demonstrated by their failure to investigate the claims in the San Francisco Action before filing the suit.  This failure to investigate is evidenced by, among other things, the failure to issue subpoenas to InComm or any other related company before bringing suit; the failure to informally engage with InComm; the apparent failure to conduct basic due diligence, including physically inspecting

the gift cards at issue, which are widely available at retail stores in San Francisco; the reliance on unverified internet accounts; and the failure to cite any California consumers who were allegedly harmed by InComm.

233.   InComm has been harmed by the institution, prosecution, and maintenance of the San Francisco Action because, among other things, it has incurred costs in defending the suit and has been required to divert its employees from their regular tasks in order to assist the company in preparing its defense. Further, InComm has been subject to negative publicity as a result of the San Francisco Action, and InComm's retail partners and customers have raised questions about the allegations.  The existence of the San Francisco Action and the claims within it have also been cited in "copycat" complaints brought by private plaintiffs, which InComm must expend time and money to defend.

234.   Chiu and the SFCAO instituted, prosecuted, and have maintained the San Francisco Action against InComm in their capacity as public attorneys acting under color of state law.

235.   Chiu and the SFCAO instituted, prosecuted, and have maintained the San Francisco Action against InComm pursuant to a policy of the SFCAO and the City of San Francisco to file affirmative consumer protection litigation against out-of-state corporations, purportedly on behalf of the People of the State of California, in order to raise revenue for the City of San Francisco and the SFCAO.  This policy

was instituted to address growing budget shortfalls in the City of San Francisco as a whole and the SFCAO in particular.

236.   InComm brings Count I against Defendant Chiu in his official capacity.

### COUNT II
**Violation of the United States Constitution Commerce Clause: Government Action Intended to Harm Out-of-State Competition (42 U.S.C. § 1983) Against the City of San Francisco and David Chiu in His Official Capacity**

237.   InComm realleges and incorporates by reference all preceding paragraphs.

238.   The Commerce Clause grants Congress the authority to "regulate Commerce . . . among the Several States."  U.S. Const. art. I, § 8.  This grant of authority to Congress precludes states and municipalities from impermissibly regulating interstate commerce (the Dormant Commerce Clause).

239.   The Dormant Commerce Clause forbids states and localities from engaging in protectionist discrimination against interstate commerce.  They may not burden out-of-state residents to give a competitive advantage to in-state businesses.  Impermissible economic protectionism can be premised on a discriminatory purpose or discriminatory effect.

240.   Chiu and the SFCAO filed the San Francisco Action against InComm, alleging that InComm violated the UCL by, among other things (i) failing to provide security adequate to prevent foreseeable harm to holders of Vanilla Cards from

criminal and fraudulent schemes to steal cardholder balances; (ii) failing to refund cardholders whose card balances have been stolen; and (iii) misrepresenting the qualities and characteristics of Vanilla Cards.

241.   Chiu and the SFCAO have not filed any similar claims against any other provider of open-loop prepaid gift cards, including Blackhawk.  InComm is similarly situated to Blackhawk and other open-loop prepaid gift card providers in all relevant respects related to the allegations in the San Francisco complaint, including that all open-loop prepaid gift cards have been targeted by criminal package tampering schemes.  InComm has instituted security measures and programs that are at least as robust as—and frequently better than—those put in place by other gift card providers.

242.   Despite the fact that InComm and other open-loop prepaid gift card providers are similarly situated in all relevant respects with regard to the allegations made in the San Francisco Action, Chiu and the SFCAO brought suit against only one gift card provider:  InComm.

243.   The effect of the San Francisco Action is to discriminate against InComm, a Georgia corporation, in favor of Blackhawk, a California corporation, by subjecting InComm (but not Blackhawk) to the time, expense and burden of defending the litigation; by exposing InComm (but not Blackhawk) to the negative publicity and potential business consequences of being named as the sole gift card

provider defendant in the suit; and by potentially subjecting InComm (but not Blackhawk) to a judgment, settlement, or other relief.

244.   The purpose of the San Francisco Action is to discriminate against InComm, a Georgia corporation, in favor of Blackhawk, a California corporation. First, Chiu, an official elected by the citizens of San Francisco with no accountability to voters in Georgia or elsewhere, is motivated by political considerations to protect local businesses while causing harm to their competitors.  Second, Chiu and the SFCAO instituted the suit against InComm pursuant to a policy of the SFCAO and the City of San Francisco to file affirmative consumer protection litigation against out-of-state corporations, purportedly on behalf of the People of the State of California, in order to raise revenue for the City of San Francisco and the SFCAO. By suing InComm (but not Blackhawk) the City of San Francisco can raise revenues from out-of-state corporations without risk of alienating local businesses or causing them economic or business hardship, which in turn diminishes the possibility of local businesses leaving the jurisdiction (causing loss of tax revenue and jobs), or otherwise decreasing their presence in San Francisco.

245.  InComm has been harmed by the institution, prosecution, and maintenance of the San Francisco Action because, among other things, it has incurred costs in defending the suit and has been required to divert its employees from their regular tasks in order to assist the company in preparing its defense.

Further, InComm has been subject to negative publicity as a result of the San Francisco Action, and InComm's retail partners and customers have raised questions about the allegations. The existence of the San Francisco Action and the claims within it have also been cited in "copycat" complaints brought by private plaintiffs, which InComm must expend time and money to defend.

246.   Chiu and the SFCAO instituted, prosecuted, and have maintained the San Francisco Action against InComm in their capacity as public attorneys acting under color of state law.

247.   Chiu and the SFCAO instituted, prosecuted, and have maintained the San Francisco Action against InComm pursuant to a policy of the SFCAO and the City and County of San Francisco to file affirmative consumer protection litigation against out-of-state corporations, purportedly on behalf of the People of the State of California, in order to raise revenue for the City and the SFCAO. This policy was instituted to address growing budget shortfalls in the City as a whole and the SFCAO in particular.

248.   InComm brings Count II against Defendant Chiu in his official capacity.

**COUNT III**
**Defamation**
**Against David Chiu**

249.  InComm realleges and incorporates by reference all preceding paragraphs.

250.  Chiu made statements about InComm that were false and malicious to third-parties, including through press releases, press interviews, statements to reporters, social media posts, website posts, and televised interviews.

251.  In publishing false and malicious statements about InComm, Chiu failed to exercise a reasonable level of care, made statements with reckless disregard for their truth or falsity, and made statements that he knew were false.

252.  Chiu's statements were not privileged or, in the alternative, Chiu's statements were only conditionally privileged and such privilege is overcome because the statements were made with actual malice.

253.  Chiu's false statements about InComm constitute defamation per se because they relate to InComm's trade and profession as a provider of open-loop prepaid gift cards and his statements were calculated to injure InComm's business and trade by disparaging its products and integrity as a company.

254.  InComm requested that Chiu retract his defamatory statements at least seven days prior to filing this action, and Chiu failed to do so.

**COUNT IV**
**Stigma-Plus Defamation (42 U.S.C. § 1983)**
**Against David Chiu in His Official Capacity**

255.  InComm realleges and incorporates by reference all preceding paragraphs.

256.  Chiu defamed InComm by publishing unprivileged, false statements about InComm's business, including an exhortation that consumers should avoid purchasing Vanilla Cards altogether in order to protect against fraud.

257.  Chiu's defamatory statements violated the Due Process Clause of the United States Constitution because they resulted in the significant alteration or extinguishment of a right or status recognized by state law, including InComm's right under Article I, Section 20 of the California Constitution and Section 671 of the California Civil Code to have its property treated equally to that of California citizens.  By targeting defamatory statements at InComm while favorably treating a similarly-situated California citizen, Blackhawk, Chiu harmed InComm's reputation and deprived InComm of its state constitutional and statutory right to equal treatment with respect to property under California law.

258.  Chiu's statements, combined with the initiation of a baseless and unlawfully-motivated enforcement action, not only damaged InComm's reputation but also harmed InComm's intangible property interests in its business reputation and goodwill, resulting in the foreclosure of future business opportunities.  This

constitutes an unlawful interference with InComm's property rights without due process of law.

259.  Chiu's statements, combined with the initiation of a baseless and unlawfully-motivated enforcement action, have also burdened InComm's present and future business dealings by casting an unwarranted suspicion of fraud or dishonesty.  This constitutes an unlawful interference with InComm's property rights without due process of law.

260.  Chiu made the defamatory statements against InComm in his capacity as a public attorney acting under color of state law.

261.  InComm brings Count IV against Defendant Chiu in his official capacity.

## COUNT V
### Declaratory Judgment (28 U.S.C. §§ 2201-2202)
### Against the City of San Francisco and David Chiu in His Official Capacity

262.  InComm realleges and incorporates by reference all preceding paragraphs.

263.  A real and justiciable controversy exists over whether the events set forth above were lawful or, as InComm contends, constituted violations of its rights. InComm contends Defendants' actions violated the Equal Protection Clause and the

Dormant Commerce Clause, and constituted defamation under Georgia law and the Fourteenth Amendment's Due Process Clause.

264.    Accordingly, InComm requests a declaration that (i) Defendants' conduct violated the Equal Protection Clause of the United States Constitution; (ii) Defendants' conduct violated the Dormant Commerce Clause of the United States Constitution; (iii) Chiu's statements constituted defamation under Georgia law; and (iv) Chiu's statements constituted stigma-plus defamation in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

InComm respectfully prays for judgment in its favor and the following relief:

a.    A declaratory judgment that Defendants' actions violate the Equal Protection Clause of the Fourteenth Amendment and the Dormant Commerce Clause and constitute Georgia state law and stigma-plus defamation.

b.    Preliminary and permanent injunctive relief restraining Defendants from prosecuting the San Francisco Action and from making further defamatory statements regarding InComm.

101

c.    Nominal, compensatory, and punitive damages for Counts I, II and IV, in an amount to be determined at trial.

d.    Nominal and punitive damages for Count III, in an amount to be determined at trial.

e.    An award of reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable laws in an amount to be determined by the Court.

f.    Pre-and post-judgment interest.

g.    Such other and further relief as may be just and proper.

Respectfully submitted, this 20th day of November, 2024.

*/s/ James W. Cobb*
James W. Cobb
Georgia Bar No. 420133
Sarah Brewerton-Palmer
Georgia Bar No. 589898
Alan M. Long
Georgia Bar No. 367326
**CAPLAN COBB LLC**
75 Fourteenth Street NE, Suite 2700
Atlanta, Georgia 30309
Tel:   (404) 596-5600
Fax:   (404) 596-5604
*jcobb@caplancobb.com*
*spalmer@caplancobb.com*
*along@caplancobb.com*

Jane Metcalf (*pro hac vice* application forthcoming)
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
Tel:    (212) 336-2000
Fax:   (212) 226-2222
*jmetcalf@pbwt.com*

*Attorneys for Plaintiffs Interactive Communications International, Inc. and InComm Financial Services, Inc.*