## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

INTERACTIVE
COMMUNICATIONS
INTERNATIONAL, INC. and
INCOMM FINANCIAL
SERVICES, INC.,

    *Plaintiffs*,

    v.

DAVID CHIU and the CITY AND
COUNTY OF SAN FRANCISCO,

    *Defendants*.

Civil Action No. 1:24-cv-05335-VMC

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PURSUANT TO RULES 12(b)(2) AND 12(b)(6) AND MOTION TO STRIKE
PURSUANT TO RULE 12(f)**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

FACTUAL BACKGROUND ................................................................2

ARGUMENT ................................................................................6

I.    Defendants Are Subject to Personal Jurisdiction in Georgia .......................7

      A.    The Court Must Accept InComm's Allegations as True .....................7

      B.    Jurisdiction Under Subsection (1) of the Long-Arm Statute ...............8

            1.    Subsection (1)'s Expansive Reach .............................8

            2.    The San Francisco Action Is a "Transaction of Business"
                  Under Subsection (1) ...................................................10

            3.    Defendants' Additional Acts Compound Their
                  "Transaction of Business" ............................................11

            4.    Defendants' "Limitations" on Subsection (1) .........................12

            5.    Subsection (1) Allows Jurisdiction Over InComm's
                  Defamation-Related Claims ...........................................15

      C.    Personal Jurisdiction Is Consistent with Due Process ......................17

            1.    InComm's Claims Arise from Defendants' Forum-
                  Directed Conduct.........................................................17

            2.    Fair Play and Substantial Justice .............................17

II.   Compulsory-Counterclaim Rules Do Not Apply ...........................................19

III.  Defendants' Immunity Defenses Fail.......................................................20

      A.    The Eleventh Amendment Does Not Bar Injunctive Relief ..............21

      B.    Defendants Cannot Claim State Immunity .........................................22

      C.    Personal Immunity Does Not Bar Claims Against Chiu ...................26

IV.   InComm Has Alleged *Monell* Liability Because Chiu Is a Final
      Policymaker for the City of San Francisco ...................................................27

V.    InComm Has Stated a Class-Of-One Claim................................................28

VI.   InComm Has Stated a Claim Under the Dormant Commerce Clause .........30

i

VII.   InComm Has Stated a Claim Based on Chiu's False, Defamatory, and
       Nonprivileged Statements ................................................................................31

VIII.  InComm Has Stated a Stigma-Plus Defamation Claim ................................33

IX.    Defendants' Remaining Arguments Fail........................................................34

       CONCLUSION ................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Super. Ct. of Orange Cnty.*,
   9 Cal. 5th 642 (Cal. 2020) ...........................................................................24, 25

*Aero Toy Store, LLC v. Grieves*,
   279 Ga. App. 515 (Ga. Ct. App. 2006) .......................................................10, 13

*Amin v. O'Brien*,
   2025 WL 90116 (S.D. Ga. Jan. 14, 2025) ........................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................6

*Bacchus Imports, Ltd. v. Dias*,
   468 U.S. 263 (1984) .........................................................................................30

*Berry College, Inc. v. Rhoda*,
   2013 WL 12109374 (N.D. Ga. 2013)...........................................................14, 15

*Biro v. Condé Nast*,
   807 F.3d 541 (2d Cir. 2015) .............................................................................33

*Calder v. Jones*,
   465 U.S. 783 (1984) .........................................................................................17

*Cannon v. City of W. Palm Beach*,
   250 F.3d 1299 (11th Cir. 2001) ........................................................................34

*Cassells v. Hill*,
   2010 WL 4616573 (N.D. Ga. Nov. 8, 2010).....................................................21

*Church of Scientology v. Wollersheim*,
   42 Cal. App. 4th 628 (Ca. Ct. App. 1996).........................................................20

*Cronin v. Washington Nat'l Ins. Co.*,
   980 F.2d 663 (11th Cir. 1993)...........................................................................16

*Defense Distrib. v. Grewal*,
   971 F.3d 485 (5th Cir. 2020).......................................................................18, 19

iii

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*,
  593 F.3d 1249 (11th Cir. 2010).............................................................8, 9, 10, 13

*ETS Payphone, Inc. v. TK Indus.*,
  236 Ga. App. 713 (Ga. Ct. App. 1999) ..............................................................13

*First Nat'l Bank of Ames, Iowa v. Innovative Clinical & Consulting
  Servs. LLC*,
  280 Ga. App. 337 (Ga. Ct. App. 2006) .........................................................12, 18

*Fitzwater v. City & Cnty. of San Francisco*,
  9 F. App'x 695 (9th Cir. 2001).............................................................................22

*Florida Transp. Servs., Inc. v. Miami-Dade Cnty.*,
  703 F.3d 1230 (11th Cir. 2012).............................................................................30

*Grider v. City of Auburn, Ala.*,
  618 F.3d 1240 (11th Cir. 2010).............................................................................29

*Griffin Indus., Inc. v. Irvin*,
  496 F.3d 1189 (11th Cir. 2007).............................................................................28

*Grizzle v. Kemp*,
  634 F.3d 1314 (11th Cir. 2011).............................................................................21

*Hammer v. Slater*,
  20 F.3d 1137 (11th Cir. 1994).........................................................................32, 33

*Hannon v. Beard*,
  524 F.3d 275 (1st Cir. 2008) ................................................................................19

*Haven v. Bd. of Tr. of Three Rivers Reg'l Library Sys.*,
  625 F. App'x 929 (11th Cir. 2015)........................................................................23

*Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of
  Ames, Iowa*,
  279 Ga. 672 (Ga. 2005) .................................................................................*passim*

*IOU Central, Inc. v. Embryolisse USA, Inc.*,
  2021 WL 2557501 (N.D. Ga. Mar. 22, 2021) ......................................................14

*Irving v. Bd. of Chosen Freeholders of Burlington Cnty.*,
  2019 WL 955359 (N.D. Ga. Feb. 26, 2019).........................................................15

*Jones v. Pulte*,
  2024 WL 2729713 (N.D. Ga. Mar. 27, 2024) ...................................................16

*Kentucky v. Graham*,
  473 U.S. 159 (1985) ...........................................................................................26

*Licciardello v. Lovelady*,
  544 F.3d 1280 (11th Cir. 2008) ...................................................................17, 18

*Lightfoot v. Henry Cnty. Sch. Dist.*,
  771 F.3d 764 (11th Cir. 2014) .....................................................................23, 24

*Lundgren v. McDaniel*,
  814 F.2d 600 (11th Cir. 1987) ..........................................................................26

*Manders v. Lee*,
  338 F.3d 1304 (11th Cir. 2003) (*en banc*) ....................................................23, 26

*McAdams v. Jefferson Cnty. 911 Emer. Commc'ns Dist., Inc.*,
  931 F.3d 1132 (11th Cir. 2019) .............................................................24, 25, 26

*McMillian v. Johnson*,
  88 F.3d 1573 (11th Cir. 1996) ..........................................................................27

*Media Matters for Am. v. Paxton*,
  2024 WL 1773197 (D.D.C. Apr. 12, 2024) .........................................11, 17, 19

*Michel v. NYP Holdings, Inc.*,
  816 F.3d 686 (11th Cir. 2016) ..........................................................................33

*Mitchum v. Foster*,
  407 U.S. 225 (1972) ...........................................................................................34

*Monell v. Dep't of Social Servs.*,
  436 U.S. 658 (1978) ...........................................................................................27

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977) ...........................................................................................22

*O'Neal v. Home Town Bank of Villa Rica*,
  237 Ga. App. 325 (Ga. Ct. App. 1999) ..............................................................32

*Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Oregon*,
   511 U.S. 93 (1994) ............................................................30

*Oskouei v. Matthews*,
   2025 WL 515811 (Ga. Feb. 18, 2025) ...............................32

*Otis v. Cheadle*,
   2024 WL 3830023 (N.D. Ga. July 29, 2024), *R&R adopted*, 2024
   WL 4251741 (N.D. Ga. Aug. 13, 2024)................................10, 11, 14

*Port Auth. Trans-Hudson Corp. v. Feeney*,
   495 U.S. 299 (1990) ........................................................23

*Pembaur v. City of Cincinnati*,
   475 U.S. 469 (1986) ....................................................27, 28

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
   344 U.S. 237 (1952) ........................................................35

*PuffCuff, LLC v. Quality Plastic Prods., Inc.*,
   2022 WL 18460462 (N.D. Ga. Mar. 30, 2022) .....................8

*Quality Assocs., Inc. v. Procter & Gamble Distrib. LLC*,
   949 F.3d 283 (6th Cir. 2020) ...........................................20

*Refresco Bevs. U.S. Inc. v Califormulations, LLC*,
   2021 WL 5629006 (M.D. Ga. Nov. 30, 2021). .....................13

*Saunders v. Saunders*,
   2023 WL 2372057 (N.D. Ga. Jan. 31, 2023) .......................8

*Sewell v. Town of Lake Hamilton*,
   117 F.3d 488 (11th Cir. 1997)..........................................27

*StopLoss Specialists, LLC v. VeriClaim, Inc.*,
   340 F. Supp. 3d 1334 (N.D. Ga. 2018) ..............................33

*Swanson v. City of Chetek*,
   719 F.3d 780 (7th Cir. 2013)...........................................29

*Terry v. Ability Recovery Servs., LLC*,
   2023 WL 5154543 (N.D. Ga. July 3, 2023) .........................12

*Thomas v. Brown*,
    504 F. App'x 845 (11th Cir. 2013)..................................................................16

*Vennwest Glob. Techs. Inc. v. McGovern*,
    2024 WL 4868264 (N.D. Ga. Sept. 13, 2024) ..................................................35

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002) ........................................................................................22

*Yahoo! Inc v. La Ligue Contre Le Racisme et L'Antisemitisme*,
    145 F. Supp. 2d 1168 (N.D. Cal. 2001) ...........................................................17

*Ex Parte Young*,
    209 U.S. 123 (1908) ........................................................................................21

**Statutes**

Cal. Civ. Code § 671 ..........................................................................................34

Cal. Gov. Code § 970 ..........................................................................................26

Cal. Gov. Code § 12550, *et seq.* .........................................................................25

Cal. Gov. Code § 41801, *et seq.* .........................................................................23

O.C.G.A. § 9-10-91 ....................................................................................*passim*

42 U.S.C. § 1983 .......................................................................................*passim*

## PRELIMINARY STATEMENT

InComm's comprehensive Complaint alleges that Defendants wielded their law enforcement powers for unconstitutional purposes. It recounts how Defendants filed a scathing lawsuit that accused InComm of causing gift card fraud, with no factual basis (the "San Francisco Action"). It describes how Defendant Chiu, the San Francisco City Attorney, repeatedly defamed InComm in the media. It explains that Defendants singled out InComm while unaccountably sparing Blackhawk, InComm's Bay Area competitor. Finally, it alleges facts suggesting that Defendants acted with two improper motives: (1) generating revenue for the local budget; and (2) giving Blackhawk a competitive boost at InComm's expense. These exhaustive factual allegations—all of which must be accepted as true at this stage—form the basis of InComm's § 1983 claims for violations of the equal protection and dormant commerce clauses, as well as its state-law and "stigma plus" defamation claims.

Defendants' motion to dismiss the Complaint, however, contains precious little discussion of the Complaint. Instead, Defendants offer up a series of procedural roadblocks, none of which applies here. Defendants argue that the Court lacks personal jurisdiction, but they rely on an incorrect reading of the long-arm statute. They invoke Eleventh Amendment immunity, but cannot show that they are arms of the State. And although Defendants imply that their affiliation with a California municipality should exempt them from suit, courts that have considered similar

arguments have categorically rejected them.  Despite Defendants' best efforts, there is no procedural bar to InComm's Complaint.

Even when Defendants get around to the merits of the Complaint, they do not engage with its factual allegations, which they characterize in broad and spectacularly inaccurate terms.  For example, they assert that InComm alleged "no *facts* to show that the City has a policy of using UCL . . . recoveries to cover budget shortfalls."  Mot. 23.  But the Complaint contains detailed allegations on that subject, which reference the City's own statements in support of more "revenue-generating [UCL] work" to "recover[] revenue for the City."  Compl. ¶¶ 175, 163-86.  Similarly, Defendants dismiss InComm's allegations of Chiu's reckless disregard for the truth as "conclusory," but InComm has recounted in detail his defiant ignorance of the facts underlying his public remarks.  *Id.* ¶¶ 107-17, 120-35, 212-13, 218-24. Defendants cannot will the Complaint's allegations, or InComm's claims, out of existence.  They have shown no basis for dismissal, and their motion should be denied.

## FACTUAL BACKGROUND

InComm's 264-paragraph Complaint sets forth robust factual allegations to support each of its claims.  The Complaint recounts the emergence in 2022 of an international crime ring engaged in prepaid card fraud (Compl. ¶¶ 70-77, 82-87), resulting in an increase in fraud across the industry (*id.* ¶¶ 71, 90-93).  Among the

affected businesses was InComm, whose products include the popular Vanilla Gift Cards, which function similarly to debit cards but are "anonymous," allowing for easy transfer from gift giver to recipient. *Id.* ¶¶ 52-57.

Next, the Complaint summarizes the efforts of law enforcement agencies at the federal, state, and local level to combat this criminal activity (*id.* ¶¶ 79-81, 85-89), and the support InComm has provided to these efforts (*id.* ¶¶ 79, 94-96). It details the effective techniques that InComm has deployed to prevent fraud, both before and after the emergence of the crime ring. *Id.* ¶¶ 61-65, 97-99. It explains that, because the costs of fraud fall heavily on InComm, InComm is highly motivated to prevent and combat it. *Id.* ¶¶ 66-69, 100.

The Complaint alleges that while other U.S. cities and states were working with InComm to combat fraud, San Francisco—led by City Attorney David Chiu's office ("SFCAO")—abruptly pointed a finger at InComm by filing the San Francisco Action. *Id.* ¶¶ 16, 101. They blamed gift card fraud on InComm's "insufficient security," which purportedly gave fraudsters "easy access" to valuable card information. *Id.* ¶¶ 1, 16, 102.

This theory broke sharply with the consensus of law enforcement professionals nationwide—making it all the more unusual that Defendants embraced it with little to no investigation. As the Complaint alleges, Defendants sought no information from InComm or its partner banks before filing suit. *Id.* ¶ 110. Nor do

they appear to have obtained information from *anyone* else with firsthand knowledge of gift card fraud—such as law enforcement, retailers, or even a ***single*** consumer who had experienced InComm's "consumer fraud." *Id.* ¶¶ 108-10. Defendants' pleading also misstated basic facts about gift card fraud and security—the central subjects of their claims. *Id.* ¶¶ 111-17.

Another notable feature of the San Francisco Action was its singular focus on InComm's products, though competitor products had been equally targeted by fraud. The San Francisco Action compared Vanilla Gift Cards unfavorably to several competitive products, which supposedly had better security features. But, as set forth in the Complaint, these comparative allegations were not only wrong; they revealed profound ignorance of their subject matter. *Id.* ¶¶ 118-35. It was evident that Defendants had never examined the product packages they were comparing, and did not understand the nature of the products themselves. *Id.* ¶¶ 123-35.

This defiant ignorance persisted after the suit's filing, as Chiu took to the media—including an Atlanta news station—to declare InComm's complicity in card fraud. As detailed in the Complaint (*id.* ¶¶ 32-35, 205-25), Chiu touted his office's suit against the "Georgia-based maker of Vanilla gift cards" and claimed that Vanilla Gift Cards lacked "industry-standard security features." *Id.* ¶¶ 206-07. In his Atlanta TV appearance, Chiu berated InComm for its "inadequate packaging," claiming that InComm could have prevented fraud for "a mere penny on the dollar."

*Id.* ¶ 214.   In another, he flat-out "***recommend[ed] that people not purchase***" InComm's products.  *Id.* ¶ 211.

It is evident that, throughout Chiu's campaign to "sound the alarm" (his words) about the causes of gift card fraud, he had no idea what he was talking about. *Id.* ¶ 206.   In one telling exchange, a reporter probed Chiu about how, exactly, "scammers" perpetrate their frauds.  Though Chiu did not know, he did not miss a beat.  He described gift card fraud as "pretty unsophisticated," then gave an account of its mechanics that had no basis in fact whatsoever.   *Id.* ¶¶ 211-13 (Chiu's account); ¶¶ 70-80 (explanation of gift card fraud from the U.S. Department of Homeland Security).  Notably, at no point in his media appearances did he elucidate any facts supporting the link between InComm's "subpar" security and gift card fraud.  That is because they do not exist.

In short, Defendants launched a sustained offensive against InComm, declaring it the "culprit" of gift card fraud and invidiously comparing it to its competitors, with no factual basis.  These acts have threatened serious damage to InComm's business and reputation, and cost it significant legal fees.  *Id.* ¶¶ 36, 225.

Though InComm cannot know what possessed Defendants to pursue this unfounded campaign, the Complaint outlines facts pointing to two likely motivations.  *First*, as San Francisco faces a dire budget shortfall, Defendants initiated the San Francisco Action to shake down an out-of-state company for quick

revenue. *Id.* ¶¶ 26, 155-62. The unusual structure of the California Unfair Competition Law ("UCL") enables this conduct. *Id.* ¶¶ 146-54. And the SFCAO has publicly described "consumer-protection" suits as a source of "revenue for the City," naming its suit against InComm as a prime example. *Id.* ¶¶ 29, 163-76.

*Second*, the facts raise an inference of another improper motive: competitive favoritism toward Blackhawk, InComm's Bay Area rival, with which the San Francisco Action draws invidious and baseless comparisons. *Id.* ¶ 187. InComm's Complaint alleges that Defendants are desperate to keep businesses in the Bay Area. It alleges that the SFCAO was likely aware of the InComm-Blackhawk rivalry through mutual connections with Blackhawk. *Id.* ¶¶ 191-93. And it alleges that the SFCAO has evinced a preoccupation with Blackhawk throughout the San Francisco Action. *Id.* ¶¶ 131-35, 194-96. These factual allegations amply support the inference that Defendants targeted InComm to serve local economic interests, and not with any legitimate factual basis or law enforcement purpose.

## ARGUMENT

Defendants offer the Court a laundry list of reasons not to entertain InComm's claims, but each is fatally flawed. When Defendants get around to the merits of InComm's Complaint, they do not meaningfully contest that its factual allegations "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). Their motion should be denied.

## I.    Defendants Are Subject to Personal Jurisdiction in Georgia

Defendants, from their post in California, chose to single out InComm, a Georgia company, for an ongoing adversarial relationship.  They targeted it with a frivolous lawsuit and attacked it in media outlets, including one in Georgia.  Now, Defendants deny that they may be held to account in Georgia for these persistent attacks on a Georgia company.  They insist that InComm must seek them out on *their* turf, in California.

That does not seem right, and indeed is not.  Jurisdiction over Defendants is proper, first, under Georgia's long-arm statute, which permits jurisdiction over a defendant who "transacts any business" in Georgia.  Defendants' contrary argument is based on an artificially narrowed interpretation of the long-arm statute that the Georgia Supreme Court has unequivocally rejected.  Second, jurisdiction is proper under due process principles, as several courts have held in analogous circumstances.  To hold otherwise would leave Georgia courts powerless to protect citizens from unconstitutional conduct by out-of-state actors.

### A.    The Court Must Accept InComm's Allegations as True

As an initial matter, Defendants misstate the governing legal standard for their Rule 12(b)(2) motion, claiming that InComm must present "substantial evidence" of jurisdiction.  Mot. 5-6 (quotations omitted).  That is incorrect.  To survive a motion under Rule 12(b)(2), a plaintiff need only "alleg[e] in the complaint sufficient facts

7

to make out a prima facie case of jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (quotation omitted). Evidentiary support for these allegations is required only after a ***defendant*** "challenges jurisdiction by submitting affidavit evidence." *Id.*  Here, Defendants offered no evidence to support their position, so this Court must "construe[] the allegations in the complaint as true," *Saunders v. Saunders*, 2023 WL 2372057, at *1 (N.D. Ga. Jan. 31, 2023), and consider whether InComm has "allege[d] . . . sufficient facts . . . to support a reasonable inference" of jurisdiction," *PuffCuff, LLC v. Quality Plastic Prods., Inc.*, 2022 WL 18460462, at *1 (N.D. Ga. Mar. 30, 2022). By these standards, Defendants' motion should be swiftly denied.

## B.   Jurisdiction Under Subsection (1) of the Long-Arm Statute

By launching a sustained offensive against a Georgia company, Defendants submitted to jurisdiction under subsection (1) of the long-arm statute.  O.C.G.A. § 9-10-91(1).[1]

### 1.   *Subsection (1)'s Expansive Reach*

Defendants' motion turns on an incorrect reading of subsection (1), which provides for jurisdiction over any nonresident defendant who "[t]ransacts any business within this state." *Id*.  Twenty years ago, the Georgia Supreme Court

---

[1] Although this Court may alternatively exercise jurisdiction under subsection (3), *see* O.C.G.A. § 9-10-91(3), InComm relies solely upon subsection (1) in the interest of streamlining the disputed issues on this motion.

adopted an expansive construction of this subsection: it "overrul[ed] all prior cases that fail to accord the appropriate breadth to the . . . 'transacting any business' language," which, read correctly, has no "limiting conditions." *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa*, 279 Ga. 672, 676 (Ga. 2005). For example, the court explained, "nothing in subsection (1) limits its application to contract cases," "requires the physical presence of the defendant in Georgia," or "minimizes the import of a [defendant's] intangible contacts with the State," as opposed to tangible ones. *Id.* at 675. Accordingly, courts should not "engraft[] these [or] other requirements" onto subsection (1). *Id.*

Rather, subsection (1) provides for such broad jurisdiction that its application could, in theory, "expand the personal jurisdiction of Georgia courts beyond that permitted by constitutional due process." *Id.* In practice, then, the "transacts any business" provision should be construed as broadly as possible, up "to ***the maximum extent permitted by procedural due process***." *Id.* (emphasis added).

Courts therefore take account of all the defendant's tangible and intangible contacts with the state, allowing a wide array of conduct to satisfy this capacious definition of "transact[ing] any business." In *Diamond Crystal*, the Eleventh Circuit held that it is enough to simply "carry out" any "activity directed toward some end" in Georgia. 593 F.3d at 1264 & n.18 (quoting Webster's 3d New Int'l Dict.). There, a California food broker's arrangement of shipments to a Georgia facility satisfied

9

subsection (1)—though the broker did not physically enter Georgia, and did not even communicate directly with any Georgia entity. *Id.* at 1266-67, 1255-56. Similarly, courts have held that "a single event may be a sufficient basis for the exercise of long arm jurisdiction [under subsection (1)] if its effects within the forum are substantial enough." *Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 521 (Ga. Ct. App. 2006).

2.    ***The San Francisco Action Is a "Transaction of Business" Under Subsection (1)***

Here, there is no question that Defendants "carr[ied] out" some "activity directed toward some end" in Georgia. *Diamond Crystal*, 593 F.3d at 1264 n.18. When Defendants knowingly filed suit against a Georgia company, they instigated extensive contacts with the state, including "discovery of documents," "depositions of witnesses," and "interactions with . . . in-house counsel" in Georgia. Compl. ¶¶ 47-48. Indeed, though the San Francisco Action remains in its early stages, it has already impelled Georgia-based employees of InComm to provide affidavits, verify interrogatories, and collect documents.[2] These "effects within the forum are substantial enough" to satisfy subsection (1). *Aero Toy Store*, 279 Ga. App. at 521.

In *Otis v. Cheadle*, a court in this district recently reached the same conclusion, holding that a Tennessee attorney was subject to personal jurisdiction in

---

[2] *See, e.g.*, Decl. of Adam Brault, *People v. InComm Fin. Servs., Inc.*, CGC-23-610333 (filed May 6, 2024).

Georgia after initiating a suit in Tennessee court against a known Georgia resident. 2024 WL 3830023, at *6-8 (N.D. Ga. July 29, 2024), *R&R adopted*, 2024 WL 4251741 (N.D. Ga. Aug. 13, 2024).  Although the Tennessee lawyer had not entered Georgia or effected service there, the suit initiated a pattern of communications into Georgia—*e.g.*, through the service of subsequent motions and papers—which satisfied subsection (1).  *Id.*

On similar facts, a district court held that the analogous "transacting any business" subsection of the District of Columbia long-arm statute was satisfied when the Texas Attorney General instituted a civil investigation against a D.C. resident. *Media Matters for Am. v. Paxton*, 2024 WL 1773197, at *10 (D.D.C. Apr. 12, 2024). The court held that "[b]y targeting a D.C.-based entity . . . and demanding records from it, [the Texas AG] committed himself to a potentially long course of dealing in the District."  *Id.*  So too here:  Defendants have initiated a "course of dealing," including ongoing discovery communications, in Georgia.  That they have not physically entered Georgia or effected service there is of no consequence.

### 3.    *Defendants' Additional Acts Compound Their "Transaction of Business"*

Although the San Francisco Action is sufficient on its own to satisfy subsection (1), that is not the full extent of Defendants' "business" in Georgia.  The Complaint alleges that the lawsuit was part of Defendants' broader effort to (1) generate local "revenue" by extracting a settlement from InComm; and (2) give

a competitive boost to InComm's Bay-Area-based competitor. These agendas contemplated commercial injury to InComm in Georgia, for the benefit of Defendants' favored interests in California. *See* Compl. ¶¶ 136, 163-76. To compound this injury, Chiu then appeared on numerous news outlets—including one in Atlanta—where he trashed InComm's products and told consumers not to purchase them, all while betraying complete ignorance of the relevant facts. Compl. ¶¶ 50, 205-25.

These calculated, self-interested attacks on InComm's commercial well-being independently satisfy the "transact[ing] any business" standard. *See First Nat'l Bank of Ames, Iowa v. Innovative Clinical & Consulting Servs. LLC*, 280 Ga. App. 337, 338 (Ga. Ct. App. 2006) (standard satisfied when bank "sought to hold [a Georgia entity] responsible" for another party's nonpayment of lease and "derive economic benefit from" contacts with Georgia); *Terry v. Ability Recovery Servs., LLC*, 2023 WL 5154543, at *3-4 (N.D. Ga. July 3, 2023) (same where defendant "attempt[ed] to collect a debt" from Georgia resident via remote communications). By purposefully inflicting commercial harm on InComm, in the hopes of deriving a pecuniary gain closer to home, Defendants "transacted business" in Georgia.

### 4. *Defendants' "Limitations" on Subsection (1)*

Defendants dispute none of these facts. Instead, they ask the Court to impose precisely the type of "extraneous limitations" on subsection (1) that the Georgia

Supreme Court has foreclosed.  *See Diamond Crystal*, 593 F.3d at 1260.  **First**, Defendants assert that they are not subject to jurisdiction because they never physically entered Georgia.  But the case they rely upon was abrogated by *Innovative Clinical*, which held that subsection (1) does ***not*** require the "physical presence of the defendant in Georgia."  *See supra* 8-9; *compare* Mot. 9-10 (citing *ETS Payphone, Inc. v. TK Indus.*, 236 Ga. App. 713 (Ga. Ct. App. 1999)).  Subsequent cases have reinforced that "intangible" contacts with Georgia, including remote communications, may suffice.  *See, e.g.*, *Refresco Bevs. US Inc. v. Califormulations, LLC*, 2021 WL 5629006, at *2 (M.D. Ga. Nov. 30, 2021).

**Second**, Defendants cite *ETS Payphone* for another overruled proposition: that subsection (1) requires "extensive" contacts.  Mot. 9.  In fact "*any* degree" of contact will do, *Diamond Crystal*, 593 F.3d at 1264 n.18 (emphasis added), even "a single event," *Aero Toy Store*, 279 Ga. App. at 520.

**Third**, Defendants insist that subsection (1) requires explicitly commercial activity, as opposed to "the mere filing of a lawsuit."  Mot. 9-10.  Laying aside the fact that InComm alleges conduct beyond "the mere filing of a lawsuit," Defendants are wrong on the law.  In fact "dealings . . . of any nature" may satisfy subsection (1), *Diamond Crystal*, 593 F.3d at 1264 n.18, including the "filing of a lawsuit"

against a Georgia entity.  *See supra* 10-11 (citing *Otis*, 2024 WL 3830023).[3]

**_Fourth_**, Defendants assert that any "action taken by a government entity to enforce its state's laws" should be exempt from consideration under subsection (1). Mot. 10.  That is, they ask the Court to "engraft[]" a sweeping and "extraneous" limitation onto subsection (1), simply because they would prefer not to defend this case in Georgia.  *See Innovative Clinical*, 279 Ga. at 675.  The case they rely upon for this audacious request, *Berry College, Inc. v. Rhoda*, 2013 WL 12109374 (N.D. Ga. 2013), is nonbinding and easily distinguishable.  There, a Georgia-based college put up a billboard in Tennessee, which triggered certain fees under Tennessee law. *Id.* at *6-7.  When the college sued the Tennessee agency responsible for enforcing the billboard fees, the court held that the agency's enforcement did not constitute "transacting business" under subsection (1).  Central to its holding was the fact that the **_Georgia college_** had prompted the fees, and the agency's enforcement, by placing a billboard in Tennessee.  If not for the plaintiff's Tennessee billboard, the court reasoned, the agency "would have had no occasion to attempt to regulate

---

[3] Defendants also cite *IOU Central, Inc. v. Embryolisse USA, Inc*., 2021 WL 2557501, at *4 (N.D. Ga. Mar. 22, 2021) for the incorrect proposition that "an attorney's representation of a client in Georgia courts [i]s insufficient" to satisfy subsection (1).  Mot. 10.  In fact, the *IOU* court assumed that such activity did satisfy subsection (1), but found that specific jurisdiction was lacking because the plaintiff's claims did not "arise from this representation."  *Id.*  Here, there is no dispute that InComm's claims "arise" in significant part from Defendants' pursuit of the San Francisco Action.  *IOU Central* accordingly has no applicability here.

[p]laintiff's activities or reach into Georgia." *Id.* at *6. In the context of this plaintiff-driven sequence of events, the agency's enforcement did not satisfy subsection (1). No case to InComm's knowledge has extended the reasoning of *Berry College* beyond this distinct factual context, let alone recognized a broad "foreign-state enforcement" exemption to subsection (1).[4]

There is no basis for such an exemption here. Unlike the plaintiff in *Berry College*, InComm was simply going about its business of developing products in Georgia when Defendants abruptly launched a tortious attack on those products. By singling InComm out as they have, Defendants "transacted business" in Georgia. This Court should decline Defendants' request for a judicially created exemption, "accord [] appropriate breadth to the . . . 'transacting any business' language," and exercise jurisdiction under subsection (1). *Innovative Clinical*, 279 Ga. at 676.

5. ***Subsection (1) Allows Jurisdiction Over InComm's Defamation Claim***

***Finally***, Defendants argue that even if subsection (1) permits jurisdiction over InComm's equal protection and dormant commerce clause claims, Georgia's long-arm statute categorically "prohibits" jurisdiction over defamation claims against

---

[4] Defendants' reliance on *Irving v. Bd. of Chosen Freeholders of Burlington Cnty.*, 2019 WL 955359 (N.D. Ga. Feb. 26, 2019), is misplaced. Mot. 11. There again, the issue was not that the defendant's Georgia-directed conduct was insufficient to satisfy subsection (1), but rather that the claims did not arise out of or relate to that conduct.

nonresidents.  Mot. 11.  That is wrong.  Although subsection (2) of the statute—which InComm does *not* rely on—contains that exception, Georgia courts can and do take jurisdiction of defamation claims against nonresidents when, as here, another subsection is satisfied.  *See Jones v. Pulte*, 2024 WL 2729713, at *3–8 (N.D. Ga. Mar. 27, 2024).  Indeed, in *Amin v. O'Brien*, 2025 WL 90116, at *3-5 (S.D. Ga. Jan. 14, 2025) (Wood, J.), the court concluded that—subject to additional factfinding—a nonresident's mere ***publication*** of a podcast over the internet, making it "available to Georgia listeners," could permit jurisdiction of defamation claims against the podcaster pursuant to subsection (1).  Here, InComm alleges not only that Chiu's statements were "available to Georgia listeners," but that they were made on at least one Georgia network ***and*** were part of a sustained attack on InComm's economic interests.  This satisfies subsection (1) many times over.

Moreover, even if the statute did not imbue this Court with personal jurisdiction over InComm's defamation-related claims, the doctrine of pendent personal jurisdiction would.  *See Thomas v. Brown*, 504 F. App'x 845, 847-48 (11th Cir. 2013); *Cronin v. Washington Nat'l Ins. Co.*, 980 F.2d 663, 671 (11th Cir. 1993).  All of InComm's claims arise from the same jurisdiction-generating event: Defendants' decision to target InComm with baseless, injurious allegations to benefit local economic interests.  *See, e.g.*, Compl. ¶¶ 205-25; *see Thomas*, 504 F. App'x at 848.  This Court therefore has jurisdiction over all of them.

C.      **Personal Jurisdiction Is Consistent with Due Process**

1.      ***InComm's Claims Arise from Forum-Directed Conduct***

This Court's exercise of jurisdiction also comports with the federal due process standards for specific personal jurisdiction (*see* Mot. 13).    Though Defendants deny having "purposefully" directed their actions at Georgia, InComm's detailed allegations reflect that they deliberately inflicted injury on a Georgia business with unlawful motives.    An intentional tortious act "aimed at the forum state" that "cause[s] harm that the defendant should have anticipated would be suffered [there]" is sufficient to establish "purposeful" contacts under the due process "effects test."    *Licciardello v. Lovelady*, 544 F.3d 1280, 1286-7 (11th Cir. 2008) (citing *Calder v. Jones*, 465 U.S. 783 (1984)).    And the "filing [of] a lawsuit in a foreign jurisdiction" constitutes tortious conduct "aimed at" the target's home state.    *Yahoo! Inc v. La Ligue Contre Le Racisme et L'Antisemitisme*, 145 F. Supp. 2d 1168 (N.D. Cal. 2001); *see Media Matters*, 2024 WL 1773197, at *18-23 ("[b]y targeting a D.C.-based entity for investigation," Texas AG directed conduct at the forum).    That is exactly what Defendants did here, and InComm's claims arise from that activity.    Accordingly, the first two prongs of the due process test are satisfied.

2.      ***Fair Play and Substantial Justice***

The exercise of jurisdiction by this Court also comports with "traditional notions of fair play and substantial justice."    Though Defendants decree that Georgia

17

has "no interest whatsoever" in "whether the City's decision to sue InComm was appropriate" or "what the City does with the proceeds" of that suit, Mot. 15, in fact Georgia has a "very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury." *Lovelady*, 544 F.3d at 1288. This is particularly true in cases involving "nonresidents who have sought [Georgia's] citizens out for the purpose of business gain." *First Nat'l Bank*, 280 Ga. App. at 338. Here, InComm has alleged that Defendants unlawfully "sought [InComm] out" in an effort to favor local economic interests. The Georgia courts have an overwhelming interest in redressing that harm.

Meanwhile, Defendants cite no authority for their argument that InComm must return to California—the distant forum of Defendants' choosing—to vindicate its rights. Though Defendants imply that their mere status as "a California municipality and its city attorney" require this result, Mot. 15, courts have consistently rejected similar arguments from public officials who direct their wrongful conduct across state lines. In *Defense Distrib. v. Grewal*, for example, a Texas firearm company sued the Attorney General of New Jersey for conduct similar to Defendants': the complaint alleged that the New Jersey AG had (1) "selective[ly]" taken action against the Texas company while sparing "similarly situated" others; and (2) publicly disparaged the company as "negligent" and harmful to consumers, encouraging others to cut business ties with it. 971 F.3d 485,

492-3 (5th Cir. 2020). Like Defendants here, the AG then contested jurisdiction in Texas, on the grounds that he had acted as a New Jersey law enforcement officer.

The Fifth Circuit disagreed. It held that the AG had submitted to jurisdiction in Texas by "project[ing] himself across state lines and assert[ing] a pseudo-national executive authority" over a Texas entity, knowing that this would have a "potentially devastating impact on [the Texas entity's business]." *Id.* at 493, 495 (cleaned up).

Similarly, in *Hannon v. Beard*, the First Circuit held that a Pennsylvania state prison official submitted to jurisdiction in Massachusetts when he "intentionally and voluntarily transferred [a prisoner] to Massachusetts to rid himself of a vexatious prisoner" with unlawfully retaliatory motives. 524 F.3d 275, 284 (1st Cir. 2008). This intentional forum-directed conduct made a suit in Massachusetts "foreseeab[le]" to the official, and also gave Massachusetts "an interest in adjudicating th[e] dispute." *Id.*; *see Media Matters*, 2024 WL 1773197, at *10.

The result can be no different here. Though Defendants may be "a California municipality and its city attorney," they intentionally aimed their conduct at Georgia, and must answer for it in Georgia like anyone else. Indeed, it is Defendants' request for special treatment—not the exercise of jurisdiction—that violates notions of fair play and substantial justice. This Court should deny the motion under Rule 12(b)(2).

## II.    Compulsory-Counterclaim Rules Do Not Apply

Defendants then try another escape hatch: they argue that Fed. R. Civ. P.

13(a) bars InComm's claims because InComm should have brought them as compulsory counterclaims in the San Francisco Action, per Cal. Civ. Proc. Code §§ 426.10(c), 426.30. Mot. 16. That is wrong twice over. First, "a federal court cannot enforce a state compulsory-counterclaim rule against a federal litigant outside the preclusion context." *Quality Assocs., Inc. v. Procter & Gamble Distrib. LLC*, 949 F.3d 283, 287 (6th Cir. 2020). Preclusion "comes into play only when a state court has entered a final judgment." *Id.* at 289. Until then, "a state court and a federal court" may preside concurrently over cases "implicat[ing] compulsory counterclaims." *Id.* Because the San Francisco Action is nowhere near a final judgment, California's compulsory-counterclaim rule has no application here.

Second, the rule is inapplicable by its own terms. InComm's Complaint does not arise from "the same transaction [or] occurrence" as the San Francisco Action, but from Defendants' conduct surrounding that action. Under California law, a claim that "arises out of the litigation process itself" is not "'related' to the transaction or occurrence which is the subject of the [original] complaint." *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 651 (Ca. Ct. App. 1996).

## III. Defendants' Immunity Defenses Fail

Defendants' attempts to dodge InComm's claims do not stop there. Next they claim Eleventh Amendment immunity, which attaches only to **State** actors, not municipal ones like Defendants. Though Defendants seek to bridge this gap by

claiming that they took the disputed acts as "arms of the state," rather than of San Francisco, they do not and cannot offer any support for that assertion.  As the Complaint demonstrates, Defendants acted with local autonomy, which defeats their claim for State immunity.  And in any event, such immunity is categorically inapplicable to claims for injunctive relief in official capacity suits.[5]

A.    **The Eleventh Amendment Does Not Bar Injunctive Relief**

To start, even if Defendants **had** acted as "arms of the state" (which they did not), Eleventh Amendment immunity would be unavailable for InComm's claims for prospective injunctive relief against Chiu.  Though Defendants concede as much in a footnote, Mot. 17 n.10, they also confusingly refer to their Eleventh Amendment defense as if asserting it as to all claims, Mot. 17-19.  To be clear: a "suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis . . . does not violate the Eleventh Amendment."  *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (*citing Ex Parte Young*, 209 U.S. 123 (1908)).  Insofar as InComm's Complaint seeks "prospective" relief against Chiu, the Eleventh Amendment is inapplicable, regardless of Defendants' attempts to recast themselves as "arms of the state."  *See*

---

[5] Defendants raise immunity defenses only with respect to InComm's § 1983 claims, Counts I, II and IV.  Immunity defenses are unavailable with respect to InComm's state-law defamation claim against Chiu (Count III).  *See, e.g.*, *Cassells v. Hill*, 2010 WL 4616573, at *6 (N.D. Ga. Nov. 8, 2010).

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); Compl. Prayer for Relief.

B.    **Defendants Cannot Claim State Immunity**

More importantly, Defendants are municipal rather than State actors, and thus are not entitled to Eleventh Amendment immunity on any claim.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81 (1977); *Fitzwater v. City & Cnty. of San Francisco*, 9 F. App'x 695, 696 (9th Cir. 2001) ("[T]he City and County of San Francisco are not entitled to Eleventh Amendment immunity [from] § 1983 claim[s].").  In arguing otherwise, Defendants observe that the California UCL empowers City Attorneys to sue on behalf of the State, and that they did so in the San Francisco Action, thereby making the State "the real party in interest" in that action.  According to Defendants, "that alone is enough" to establish that they undertook the disputed conduct as "arms of the state."  Mot. 18-19.

By focusing on the identity of the plaintiff in the San Francisco Action, Defendants have answered the wrong question.  To invoke sovereign immunity in this case, Defendants must show that they acted as "arms of the state" when undertaking the conduct at issue in this case.  That includes Defendants' decision to target InComm with a UCL suit, motivations for doing so, and conduct of the litigation.  Accordingly, the question is whether Defendants undertook **these** acts as autonomous local actor or merely executed the State's edicts as "arms of the state."

Courts in the Eleventh Circuit consider four factors to determine if a defendant is an "arm of the state" for Eleventh Amendment purposes: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003) (*en banc*). Critically, it is Defendants' burden to demonstrate their entitlement to Eleventh Amendment immunity, yet in their motion they address *none* of the *Manders* factors, all of which weigh strongly against them. *See Haven v. Bd. of Tr. of Three Rivers Reg'l Library Sys.*, 625 F. App'x 929, 933 (11th Cir. 2015).

**(1) How state law defines the entity.** Under California law, the City Attorney is designated a *city* officer. *See* Cal. Gov. Code Title 4 (providing for "government of cities," including appointment of a city attorney, distinct from government of the state addressed in Title 2); Cal. Gov. Code § 41801, *et seq.* (defining duties of City Attorney as an officer of a City). City officers like the City Attorney are independent from their state counterparts, as the Complaint's allegations underscore. Compl. ¶¶ 43-46, 168-73 (City Attorney is accountable to city voters and acts in service of the city). "[W]hen a State creates subdivisions and imbues them with a significant measure of autonomy . . . these subdivisions are too separate from the State to be considered its 'arms.'" *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 771 (11th Cir. 2014) (quoting *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 313

23

(1990)).  Thus, the City Attorney's status as a city entity weighs against sovereign immunity.

Though the UCL provides city attorneys with standing to bring suit "in the name of the . . . State," Cal. Bus. & Prof. Code § 17204, a standing provision in one statute does not transform the SFCAO into a state entity.  *See Lightfoot*, 771 F.3d at 771 (existence of "power[s] and duties . . . derived from state law" does not transform city entity into state entity).  Regardless of its standing to bring suit under the UCL, the San Francisco City Attorney's Office remains just that:  an office of the City of San Francisco.

*(2) Degree of state control.*  Most critically here, the State of California has no control whatsoever over when, how, or why the SFCAO pursues UCL cases.  *See, e.g.*, *McAdams v. Jefferson Cnty. 911 Emer. Commc'ns Dist., Inc.*, 931 F.3d 1132, 1135 (11th Cir. 2019) (no immunity in the absence of evidence that state "exert[ed] any control" over local personnel decisions); *Abbott Labs. v. Super. Ct. of Orange Cnty.*, 9 Cal. 5th 642, 650, 655 (Cal. 2020) (UCL confers "unilateral[]" discretion for local attorneys to bring statewide enforcement actions).  The UCL endows the SFCAO with broad standing, but it is for the SFCAO to decide how—if at all—to use it.  The Complaint underscores this point, alleging that the SFCAO is empowered to develop "entrepreneurial" UCL cases; that it purposefully uses UCL enforcement power to capture "revenue for the City"; and that it pursued the San Francisco Action

to serve that and other local economic agendas.  Compl. ¶¶ 139-140, 175, 187-96.

This unfettered autonomy distinguishes the SFCAO from many public prosecutors, including those in California.  For example, the California Constitution gives the State Attorney General "direct supervision over every district attorney . . . in all matters."  Cal. Const. Article V § 13; *see* Cal. Gov. Code § 12550, *et seq.* (detailing supervisory powers over district attorneys); *Abbott Labs*., 9 Cal. 5th at 659, 662 ("When a district attorney prosecutes criminal violations of state law, he or she acts in a state rather than a local capacity.").  Yet California law leaves city attorneys like the SFCAO to their own devices.  For this reason, Defendants' reliance on Eleventh Amendment cases involving criminal prosecutions, *see* Mot. 19-20, is misplaced.  Defendants did not act at the State's behest when targeting InComm, and they are not entitled to the State's immunity now.

***(3) Source of funds.***  This factor likewise weighs against immunity.  The SFCAO's work is primarily funded by the City's General Fund, and is entirely dependent on the City's municipal budget.  *See* Compl. ¶ 167 & n.61.  Further, the UCL specifies that the City may also fund the SFCAO's work through recoveries that the SFCAO itself obtains from its affirmative litigation—which are paid into the City's treasury.  Cal. Bus. & Prof. Code § 17206(f); *see* Compl. ¶¶ 169-76 (alleging Defendants' use of UCL litigation to generate "revenue for the City").  As in *McAdams*, the City's UCL recoveries are not "monies or properties of the state," nor

are its UCL activities funded by the state. 931 F.3d at 1135-36. This is another strike against sovereign immunity.

*(4) Responsibility for judgments.* Finally, California state law specifies that when cities and counties are held liable for damages, they "shall pay any judgment." Cal. Gov. Code §§ 970(c), 970.2. Those funds come from the local entity's purse— not the state's—so the state would not be liable for InComm's damages in this action. *See id.* §§ 970.4, 970.8; *McAdams*, 931 F.3d at 1136 (where state law mandated county entity could "be sued" and any debts were "solely the obligation[] of the district," fourth factor did not favor immunity). This, too, weighs against Defendants' invocation of Eleventh Amendment Immunity. In sum, Defendants cannot show that they are entitled to immunity under *Manders*, and have not even tried. As municipal actors, they are not entitled to Eleventh Amendment immunity.

### C.    Personal Immunity Does Not Bar Claims Against Chiu

Finally, Defendants wrongly argue that Chiu is immune from InComm's § 1983 claims under the doctrines of absolute and qualified immunity. *See* Mot. 17. Because InComm has sued Chiu *in his official capacity*, personal immunity defenses are inapplicable—another point Defendants concede. Mot. 17 n.10; *see Kentucky v. Graham*, 473 U.S. 159 (1985) (immunities "are unavailable" in official capacity actions); *Lundgren v. McDaniel*, 814 F.2d 600, 604 (11th Cir. 1987).

**IV.    InComm Has Alleged *Monell* Liability Because Chiu Is a Final Policymaker for the City of San Francisco**

Next Defendants argue that, even if Chiu acted as a municipal officer rather than an "arm of the state," he is immune from liability because he did not commit his unlawful acts pursuant to any municipal "custom or policy."  Mot. 22-23 (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978)).    According to Defendants, InComm alleges "no *facts*" to demonstrate a custom of using UCL suits for local revenue, so a § 1983 claim cannot survive based on Chiu's "isolated" decision to do so here.  Mot. 23 (emphasis in original).

Not only is this characterization of the Complaint grossly inaccurate, *see* Compl. ¶¶ 263-286, but Defendants once again misstate the applicable legal standard.  An official government policy for *Monell* purposes includes any decision "created by an official of such rank that he . . . could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (*Monell* liability attaches to "a deliberate choice to follow a course of action" when made "by the official . . . responsible for establishing final policy with respect to the subject matter in question").  Contrary to Defendants' misstatement, "[a] municipality may be held liable for a single act or decision of a municipal official with final policymaking authority." *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996).

InComm alleges—and Defendants cannot dispute—that Chiu was acting as a

final policymaker when he pursued and publicized the San Francisco Action. *See* Compl. ¶¶ 16, 25, 37, 45, 103. As City Attorney, Chiu enjoys the authority to pursue allegations of unfair and unlawful competition, with no state- or city-level oversight. *See* Cal. Bus. & Prof. Code § 17204; Compl. ¶¶ 28, 138-39, 142, 150. Chiu wielded that authority to bring the San Francisco Action: his name is on the Complaint and he vouched for the case in his media blitz. *See* Mot. Ex. A at 1, 42; Compl. ¶¶ 25, 32-35; 205-225. As in *Pembaur*, Chiu acted within his statutorily granted authority, thus ratifying his actions as the "official custom or policy" of the City. 475 U.S. at 484-85. Accordingly, the City is liable for them.

## V.    InComm Has Stated a Class-Of-One Claim

Having spent most of their motion on meritless excuses why this Court should not entertain InComm's claims, Defendants have little to say about the claims themselves. As to Count I, InComm's "class of one" equal protection claim, Defendants assert that such claims are categorically unavailable for "discretionary" or "complex" government decisions such as their decision to sue InComm. Mot. 24. The Eleventh Circuit has never adopted any such limitation, recognizing that class-of-one claims may be premised on a "complex, multi-factored government decision-making process[]" involving similarly situated entities. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007). InComm need only plausibly allege that it was "[1] intentionally treated differently from others who were 'similarly situated'

and [2] that there is no rational basis for the difference in treatment." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1263-64 (11th Cir. 2010); *see also Swanson v. City of Chetek*, 719 F.3d 780, 785 (7th Cir. 2013) (recognizing that where "animus c[an] be inferred from the sheer absurdity" of the government action, no direct comparator is required).

InComm's Complaint easily clears this hurdle. InComm's allegations show that Defendants singled out InComm as the culprit behind gift card fraud, contrary to the strong consensus of law enforcement and with virtually no factual basis. Compl. ¶¶ 73-93, 101-17. Defendants drew invidious comparisons between InComm and its competitors that, as the Complaint alleges, were so misinformed and illogical as to be almost incomprehensible. Compl. ¶¶ 118-35. Moreover, InComm's factual allegations raise a strong inference that Defendants acted with animus toward InComm and favoritism toward its local competitor, which casts further doubt on the existence of a rational basis for Defendants' actions. Compl. ¶¶ 187-96; *see Swanson*, 719 F.3d at 785 ("showing of animus" toward the plaintiff may support a class-of-one claim).

Defendants' drive-by critique of InComm's allegations that Blackhawk is similarly situated (Mot. 25) is baseless. InComm alleges facts showing that Blackhawk, too, has been targeted by the recent fraud threat, and that InComm's packaging security features are equal or superior to Blackhawk's. Compl. ¶¶ 71-

74, 79-82, 90-92, 131-35.  This is more than sufficient to state a plausible claim that Blackhawk was similarly situated in all relevant respects.

## VI.   InComm Has Stated a Claim Under the Dormant Commerce Clause

The dormant commerce clause prohibits "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Oregon*, 511 U.S. 93, 99 (1994).  This differential treatment can arise from the unequal application of facially neutral laws.  *Florida Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1249, 1257-62 (11th Cir. 2012).  Enforcing state legislation amounts to unconstitutional "economic protectionism" when it has "either discriminatory purpose . . . or discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984).

Contrary to Defendants' claims, InComm's Complaint goes far beyond the allegation that "the City did not sue California-based Blackhawk," Mot. 26, and recites detailed facts to support an inference of both discriminatory purpose and effect.  The allegations show that Defendants have endorsed the use of UCL suits to serve local economic interests (Compl. ¶¶ 167-76); that, due to mutual connections, they likely foresaw the impact of their case on the competitive dynamic between InComm and Blackhawk (*id.* ¶¶191-93); that they publicly declared Blackhawk's packaging more secure than InComm's without having evaluated its security (*id.*

30

¶¶ 131-35); and that they revealed a preoccupation with Blackhawk in discovery-related correspondence (*id.* ¶¶ 194-95). Defendants' actions have had their intended effect of tarnishing InComm's reputation and business, to Blackhawk's benefit. *Id.* ¶¶ 216-25. If these allegations do not suffice to show either discriminatory motive or effect at the pleading stage, it is difficult to imagine what would.

## VII. InComm Has Stated a Claim Based on Chiu's False, Defamatory, and Nonprivileged Statements

As to InComm's defamation claim, the Complaint alleges in detail that Chiu's statements about InComm in various media were false, defamatory, and made with actual malice. *See, e.g.*, Compl. ¶¶ 205-25. Rather than addressing these allegations, Defendants again resort to mischaracterization. For example, Defendants assert that "there is nothing false and defamatory" about "explaining how 'card draining' works." Mot. 28. That is not what Chiu did; in fact, his comments betrayed ignorance of that subject. Instead, he said that "for years" InComm knowingly "allowed criminals to steal money from unsuspecting consumers," rather than spend "a mere penny on the dollar" to improve their packaging. Compl. ¶ 214. Elsewhere, he used the word "egregious" to describe *InComm* (not "the fraud," as Defendants claim, Mot. 28), then discouraged consumers from buying InComm's products. These statements, along with the others alleged in the Complaint, are defamatory and patently false.

Chiu's false statements are also not entitled to the absolute privilege of

O.C.G.A. § 51-5-8, which extends only to statements made "in regular pleadings *filed in a court of competent jurisdiction*" (emphasis added). It does not apply to "publishing the contents of official court documents outside the judicial process," such as in the media. *O'Neal v. Home Town Bank of Villa Rica*, 237 Ga. App. 325, 332 (Ga. Ct. App. 1999). Thus, the privilege is doubly inapplicable here, where Chiu not only recounted the pleadings in the media, but made additional defamatory statements far beyond the pleadings' contents.

Defendants argue in the alternative that the statements are conditionally privileged under O.C.G.A. § 51-5-7(1), (7), and/or Georgia's anti-SLAPP law, whose "substantive" provisions confer conditional privilege in some circumstances. Mot. 29 n.17. But even assuming Chiu's statements are conditionally privileged on one or more of these bases (which InComm disputes), InComm has overcome that privilege by alleging that Chiu made them with "actual malice," *i.e.*, "knowledge that [they were] false or reckless disregard for *whether* [they were] true or false."[6] *Hammer v. Slater*, 20 F.3d 1137, 1141-2 (11th Cir. 1994) (emphasis added). Compl. ¶¶ 215-22, 101-35.

---

[6] The Georgia Supreme Court recently held that under certain circumstances the malice standard necessary to defeat conditional privilege is not this articulation of "actual malice" but mere "private malice," *i.e.*, ill will. *Oskouei v. Matthews*, 2025 WL 515811, at *1 (Ga. Feb. 18, 2025). The *Oskouei* private malice standard is less stringent than actual malice, so InComm has assumed applicability of the higher standard here. *Id.* at *12, *16 n.25.

Defendants argue that InComm's allegations of actual malice are deficient because InComm has not "ple[]d *facts*" showing Chiu's "subjective" recklessness. Mot. 30 (emphasis in original). But "Georgia courts have repeatedly held that the issue of malice . . . is generally a jury issue, inappropriate for summary judgment," let alone Rule 12 dismissal. *Hammer*, 20 F.3d at 1143 (collecting cases). InComm need only raise an inference of actual malice from the remarks' "nature and circumstances." *Biro v. Condé Nast*, 807 F.3d 541, 544-46 (2d Cir. 2015).

The Complaint does so by recounting, *e.g.*, Defendants' negligible factual investigation and the glaring inaccuracies in both the San Francisco Action pleading and Chiu's statements to the media. Compl. ¶¶ 215-22, 101-35. That is more than enough. A defamation plaintiff may survive summary judgment on actual malice by showing "numerous misrepresentations or factual errors . . . in [a] complaint" filed by the defendants, *Hammer*, 20 F.3d at 1143, or that the defendant "jumped to a . . . factual conclusion" without conducting a "bona fide investigation," *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1354 (N.D. Ga. 2018). By offering these facts at the pleading stage, InComm is ahead of the game.[7]

## VIII. InComm Has Stated a Stigma-Plus Defamation Claim

InComm has alleged a stigma-plus defamation claim—a violation of due

---

[7] In arguing that "a failure to investigate" cannot demonstrate actual malice, Defendants rely upon a case that, among other problems, applies New York law. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702-03 (11th Cir. 2016).

process—because defamatory statements by a government actor deprived it of a tangible right. *See Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1302 (11th Cir. 2001). Defendants entirely ignore InComm's allegations regarding its lost tangible interest: InComm's equal right to property under California law regardless of citizenship. Compl. ¶ 257 (citing Cal. Const., Art. I, § 20; Cal. Civ. Code § 671). Section § 671 provides that "[a]ny person, regardless of their citizenship status, may take, hold, and dispose of property, real or personal, within this state." The Complaint alleges that, by targeting InComm for economic harm based on its status as a nonresident of California, Defendants encroached upon a "recognized property or liberty interest." Mot. 31-32. That, together with the allegations supporting InComm's defamation claim, states a plausible "stigma-plus" § 1983 claim.

## IX.    Defendants' Remaining Arguments Fail

Defendants conclude with a handful of procedural arguments, each designed to pick off a portion of InComm's Complaint. None of them has merit.

***The Anti-Injunction Act.*** Defendants' invocation of the Anti-Injunction Act is misplaced. Mot. 33. The Supreme Court has held that § 1983 suits for injunctive relief are "expressly authorized by Act of Congress," and thus outside the scope of the Anti-Injunction Act. *See, e.g.*, *Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972).

***Claim for Declaratory Relief.*** Defendants urge the Court to dismiss InComm's claim for declaratory relief as an improper attempt to "frustrate action by

34

a state agency" and/or "assert an anticipatory defense." Mot. 32. But as Defendants acknowledge, a plaintiff may seek declaratory relief in the event of an "actual controversy," irrespective of any other relief sought. *Id.* (citing *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)). InComm has pled an "actual controversy" with Defendants as to each cause of action, and seeks declaratory relief alongside other forms of relief. There is nothing improper or unusual about that.

***Motion to Strike.*** Finally, Defendants resort to the "time wast[ing]" strategy of moving to strike allegations in the Complaint. *Vennwest Glob. Techs. Inc. v. McGovern*, 2024 WL 4868264, at *7 (N.D. Ga. Sept. 13, 2024). Defendants ask the Court to strike InComm's allegations that one of the attorneys prosecuting the San Francisco Action had likely become aware of the InComm-Blackhawk rivalry through a connection at his prior firm. Mot. 34. These facts are not "impertinent": rather, they suggest that Defendants knew their lawsuit would yield competitive benefits for Blackhawk, enhancing the plausibility of InComm's assertion that they intended that result. Compl. ¶¶ 191-93. Furthermore, as the Complaint expressly notes, these allegations do ***not*** impute any misconduct to the attorney; Defendants have no basis for deeming them "scandalous." The 12(f) motion should be denied.

## CONCLUSION

For the reasons above, InComm respectfully requests that the Court deny Defendants' motion to dismiss and motion to strike.

Respectfully submitted this 26th day of March 2025.

/s/ James W. Cobb
James W. Cobb
Georgia Bar No. 420133
Sarah Brewerton-Palmer
Georgia Bar No. 589898
Alan M. Long
Georgia Bar No. 367326
**CAPLAN COBB LLC**
75 Fourteenth Street NE, Suite 2700
Atlanta, Georgia 30309
Tel:   (404) 596-5600
Fax:   (404) 596-5604
*jcobb@caplancobb.com*
*spalmer@caplancobb.com*
*along@caplancobb.com*

Jane Metcalf (*pro hac vice*)
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
Tel:   (212) 336-2000
Fax:   (212) 226-2222
*jmetcalf@pbwt.com*

*Attorneys for Plaintiffs Interactive Communications International, Inc. and InComm Financial Services, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), I hereby certify that the foregoing document complies with the font and point selections approved by L.R. 5.1(C). The foregoing document was prepared using Times New Roman font in 14 point.

This 26th day of March 2025.

*/s/ James W. Cobb*
James W. Cobb
Georgia Bar No. 420133

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I caused a true and correct copy of the foregoing document to be filed with the clerk's office by this Court's CM/ECF system, which will serve a true and correct copy of the same upon all counsel of record.

This 26th day of March 2025.

/s/ James W. Cobb
James W. Cobb
Georgia Bar No. 420133